[No. B117397. Second Dist., Div. One. July 16, 1999.]

JOHN MYRICKS, Individually and as Executor, etc., et al., Plaintiffs and Appellants, v.
LYNWOOD UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Federico Castelan Sayre, Federico Castelan Sayre and Kent M. Henderson for Plaintiffs and Appellants.

Richards, Watson & Gershon and Robert C. Ceccon; Thomas Law Firm, Allen L. Thomas and Candice K. Rogers for Defendants and Respondents.

## OPINION

**ORTEGA, J.**—Plaintiffs appeal from the summary judgments entered for defendants City of Lynwood and Lynwood Unified School District. Plaintiffs are members[1] of a girls' summer basketball team, the Running Rebels, which is affiliated with the Lynwood Girls Basketball Development League. In the summer of 1994, the Running Rebels went on a road trip to play in Arizona, Colorado, and Nevada basketball tournaments. En route from Colorado to Nevada, plaintiffs were injured when the driver of their van fell asleep and lost control of the vehicle, which rolled over several times.

The sole issue on appeal is whether sufficient evidence exists to create a triable issue of fact regarding the school district's and city's potential liability for the accident. We conclude that although defendants were tangentially involved with the Running Rebels' summer basketball program, no legal basis exists to expose them to potential liability for the accident. We affirm the summary judgments.

### BACKGROUND

As a practical matter, before the accident, the Running Rebels served as a de facto summer developmental team for the Lynwood High School (LHS) girls' basketball team, the Lady Knights. In 1992, a California Interscholastic Federation (CIF) rule prohibited high school basketball coaches from coaching basketball at any level following the end of the CIF basketball season in February or March until sometime in June. In September 1992, former LHS girls' basketball coach Roberson, who was instrumental in forming the Running Rebels, was found to have violated this CIF rule by having coached the Running Rebels during spring tournaments in 1992. As a result of this violation, Roberson resigned from his coaching position at LHS, thus avoiding any CIF penalty against LHS. Roberson was replaced by LHS's junior varsity girls' basketball coach, Ellis Barfield.[2] Although Barfield had also violated the same CIF rule by serving as the Running Rebels' assistant coach during the spring, Barfield received only a five-day suspension from practicing with the Lady Knights in the 1993-1994 CIF season.

At the end of the 1993-1994 CIF basketball season, Barfield followed Roberson's practice of coaching the Running Rebels, but waited to do so until summer to avoid violating the CIF rule against coaching during the

---

[1]Solely for the sake of convenience, we will refer to the plaintiffs collectively as members of the team even though the action on behalf of Tracy Myricks's estate is being prosecuted by her father/executor, and her parents and sister are suing for her wrongful death.

[2]Barfield is a named defendant in this action, but he is not a party to this appeal.

off-season. Barfield also adopted Roberson's procedure of using the LHS gym, basketballs, and practice uniforms[3] for the Running Rebels' summer practices and road trips. Barfield did these things without asking anyone's permission at LHS.[4] Playing on the Running Rebels was not an official school activity or part of the official LHS summer "intersession" program. No school credits were given for playing on the summer team. No evidence was presented to indicate that playing on the Running Rebels was a prerequisite for playing on the Lady Knights.

In early June 1994, Barfield began planning the Running Rebels' 1994 summer schedule. Barfield held some planning meetings at the LHS gym for parents of Running Rebels' players. The record is not exactly clear, however, as to how Barfield selected the girls for the summer team. According to Barfield, he did not hold tryouts or ask girls during the regular school year to join the summer team. Due to CIF restrictions, Barfield could not ask middle school girls to show him their basketball skills before they attended LHS. Apparently, Barfield only discussed joining the Running Rebels with those girls or their parents who asked him about the summer team. From Barfield's testimony that he had given his extra Lady Knights practice uniforms to those Running Rebels players who did not already have their own, we reasonably infer the summer team was comprised of either returning or potential Lady Knights players.

At least some of the parents of Running Rebels players may have been confused about whether they were signing consent forms (that Barfield had copied from those used for the Lady Knights) for their daughters to play summer ball for the Lady Knights or the Running Rebels. Two of the Running Rebels consent forms were signed by parents who wrote "Lady Knights" as the name of the team. In addition, the booster club for the Running Rebels was comprised of the same parents who were on the Lady Knights booster club.

Even though Barfield was coaching a summer league team comprised mainly of Lady Knights members and using LHS facilities and equipment to

---

[3]The practice uniforms did not have any team name written on them. Barfield had purchased the practice uniforms in bulk for the Lady Knights players to keep as their own during and after the CIF basketball season. Those Lady Knights players who could afford to do so paid Barfield for their practice uniforms, and Barfield absorbed the cost for those who could not afford to pay. Barfield bought some additional practice uniforms that he kept and later gave to Running Rebels' players who did not already have a Lady Knights' practice uniform.

[4]The record is silent as to whether LHS had previously granted Roberson permission to use the LHS gym, basketballs, and practice uniforms for the Running Rebels' practices and road trips.

do so, he was not a paid district employee during the summer of 1994. Barfield is a paid district employee only during the CIF basketball season, and even then, he works only part-time hours.[5]

To finance the Arizona, Colorado, and Nevada road trip, Barfield solicited the city council in early June 1994 for a $10,000 donation to the Running Rebels. The city council addressed the team's request at a July 5, 1994, council meeting attended by Barfield, Connie Franklin (Running Rebels' team chaperone), and Linda George (mother of one of the players). When a council member inquired whether the donation was for the Lady Knights and whether the district had been solicited for funds, someone from the audience (presumably Barfield, Franklin, or George) said, "No, City team. . . . summer ball." Barfield also explained to the council, ". . . we approached the School District two years ago with the same type of [request], and they . . . say they can't fund us, as far as the summertime . . . because . . . the money is there first for . . . education . . . ."

The council agreed to pay $10,000 directly to the Running Rebels' vendors, and asked the team to submit an itemized list of expenses. The city ultimately issued checks to vendors for: (1) hotel payments of $2,371.77, $875, and $1,000; (2) car rental expenses of $2,453.23; and (3) tournament expenses of $2,500 and $800. The balance of the trip expenses was paid by Barfield and other private donors.

Barfield, who did not have a valid California driver's license, had his mother use her credit card to rent the two vehicles for the trip. Barfield nevertheless drove for much of the trip, which began on July 7, 1994. The accident occurred on July 23, 1994, just outside Las Vegas, about 6:40 a.m., after the team had driven all night from Colorado. It is undisputed that the van rolled over when the driver, Running Rebels' assistant coach Michelle Allen,[6] fell asleep and lost control of the vehicle. Injuries were sustained by all of the van's occupants, one of whom died at the hospital.

Allen, like Barfield, was also a part-time district employee. During the CIF basketball season, Allen had worked as the Lady Knights' assistant coach. In addition, Allen was working during the summer as a part-time, hourly employee for the city's recreation and parks department at Hamilton Park. Allen, whose daughter was on the road trip as a Running Rebels player, received no salary from the city or the district while on the trip. Although Allen was scheduled to work at Hamilton Park during the weeks of

---

[5]Barfield's deposition testimony indicated he also had a "regular job" at "Sheppard, Mullin."

[6]Allen is a named defendant in this action but is not a party to this appeal.

the trip, she did not inform her supervisor in advance of her absence and simply failed to show up for work. There is no evidence in the record that any city official was aware that Allen was going to be accompanying the team on the road trip. Allen's name was not included on the list given to the city of those persons who were going on the trip.

The police accident report attributed the following statement to Allen: "D-1 [Allen] states that she and Mr. BARFIELD were sharing the driving duties. She stated that after taking over driving duties, after about one and one-half or two hours she became tired. She states they stopped at a rest area for about two or three hours. She further states that she again began driving and again fatigue set in. Mr. BARFIELD then took over the driving duty for about two hours. Ms. ALLEN then again began driving. Ms. ALLEN states that she had pulled over twice prior to the accident due to feeling tired. Ms. ALLEN states finally she 'dozed off' one last time and woke up with the vehicle off the road surface."

After the accident, LHS administrators sent several employees, including the principal, to Las Vegas to comfort the surviving injured players at the hospital, at least one of whom was critically injured. The principal was aware of the Running Rebels' trip, having given permission to two team members to miss excessive days of summer school without being terminated. Apparently, those two team members had brought assignments or had additional assignments faxed to them on the trip.

Based on the above evidence, the trial court entered summary judgment for the district and city, finding no basis for imposing liability against them for plaintiffs' injuries. This appeal followed.

### SUMMARY JUDGMENT

■ Summary judgment is appropriate only where no material issue of fact exists or where the record establishes as a matter of law that a cause of action asserted against a party cannot prevail. After examining the facts before the trial judge on a summary judgment motion, an appellate court independently determines their effect as a matter of law. (*Nicholson* v. *Lucas* (1994) 21 Cal.App.4th 1657, 1664 [26 Cal.Rptr.2d 778].)

"An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]." (*Sinai Memorial Chapel* v. *Dudler* (1991) 231 Cal.App.3d 190, 196-197 [282 Cal.Rptr. 263].)

Under the 1992-1993 amendments to Code of Civil Procedure section 437c, a defendant seeking summary judgment need only demonstrate the plaintiff's case has no merit to shift the burden to the plaintiff to demonstrate the existence of a triable issue of material fact. (See *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579-594 [37 Cal.Rptr.2d 653].)[7]

## THE DISTRICT'S LIABILITY

"Except as otherwise provided by statute[, . . . a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815, subd. (a).) "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." (Gov. Code, § 815.2, subd. (a).)

In the context of public schools, the Legislature has established different liability rules for injuries occurring during required school-sponsored, off-premises activities, on the one hand (Ed. Code, § 44808),[8] and field trips or excursions, on the other hand (Ed. Code, § 35330).[9] (*Castro* v. *Los Angeles Bd. of Education* (1976) 54 Cal.App.3d 232 [126 Cal.Rptr. 537].)

---

[7]According to section 437c, subdivision (o)(2) of the Code of Civil Procedure, "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

[8]"Notwithstanding any other provision of this code, no school district, city or county board of education, county superintendent of schools, or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property, unless such district, board, or person has undertaken to provide transportation for such pupil to and from the school premises, has undertaken a school-sponsored activity off the premises of such school, has otherwise specifically assumed such responsibility or liability or has failed to exercise reasonable care under the circumstances.

"In the event of such a specific undertaking, the district, board, or person shall be liable or responsible for the conduct or safety of any pupil only while such pupil is or should be under the immediate and direct supervision of an employee of such district or board."

[9]"The governing board of any school district or the county superintendent of schools of any county may:

"(a) Conduct field trips or excursions in connection with courses of instruction or school-related social, educational, cultural, athletic, or school band activities to and from places in the state, any other state, the District of Columbia, or a foreign country for pupils enrolled in

■ If a student is injured while off campus for a school-sponsored activity, which is defined as an activity "that requires attendance and for which attendance credit may be given" (*Castro* v. *Los Angeles Bd. of Education, supra,* 54 Cal.App.3d at p. 236), the student's injury is treated, for liability purposes, in the same manner as an on-campus injury. "Students who are off of the school's property for *required* school purposes are entitled to the same safeguards as those who are on school property, within supervisorial limits." (*Ibid.,* italics added.)

However, if a student is injured while on a "field trip[] or excursion[] in connection with courses of instruction or school-related social, educational, cultural, athletic, or school band activities" (Ed. Code, § 35330, subd. (a)), he "*shall be deemed to have waived all claims against the district or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion. All adults taking out-of-state field trips or excursions and all parents or guardians of pupils taking out-of-state field trips or excursions shall sign a statement waiving such claims.*" (Ed. Code, § 35330, subd. (d), italics added.)[10]

■ In this case, the evidence is undisputed that the basketball trip was not a school-sponsored activity for which attendance was required and attendance credit given. The out of state tournaments were not part of LHS's formal CIF or summer intersession programs. The fact that LHS authorized two of the plaintiffs to attend the tournaments without being dropped from the summer intersession program and bring school assignments with them does not suggest the road trip was a mandatory or required school activity.[11] Similarly, Barfield's use of LHS facilities and equipment for Running

---

elementary or secondary schools. A field trip or excursion to and from a foreign country may be permitted to familiarize students with the language, history, geography, natural sciences, and other studies relative to the district's course of study for such pupils.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"*All persons making the field trip or excursion shall be deemed to have waived all claims against the district or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion. All adults taking out-of-state field trips or excursions and all parents or guardians of pupils taking out-of-state field trips or excursions shall sign a statement waiving such claims.*" (Italics added.)

[10]When a field trip or excursion is part of a required, off-site school activity, "The special 'field trip' provisions of section 35330 control over any overlapping application of the more general off-premises provisions of section 44808. *Castro* anticipated 'the possibility of a "field-trip or excursion" being permitted even during a "school-sponsored activity" . . . .' (*Castro,* v. *Los Angeles Bd. of Education, supra,* 54 Cal.App.3d 232, 236, fn. 2.) A field trip is a special type of off-premises activity, making section 35330 the special statute, should both statutes apply." (*Wolfe* v. *Dublin Unified School Dist.* (1997) 56 Cal.App.4th 126, 135 [65 Cal.Rptr.2d 280].)

[11]The trial court excluded as hearsay and for lack of foundation the declarations of two players regarding their alleged receipt of written permission from LHS to miss summer school

Rebels' practices and the district's funding of its employees' emergency postaccident trip to Las Vegas bear no relation to whether the road trip was a school-sponsored activity for which attendance was required. Plaintiffs' contention that the payment of the district employees' postaccident travel expenses constituted a subsequent ratification of the trip for purposes of establishing the district's liability is an unwarranted inference.[12] Accordingly, we conclude, as a matter of law, that plaintiffs' injuries are not governed by Education Code section 44808.

To the extent, if any, the road trip was a voluntary field trip or excursion related to LHS's girls' basketball program, the waiver provisions of Education Code section 35330, subdivision (d) must control. Under that statute, assuming it applies, plaintiffs are *"deemed to have waived all claims against the district or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion."* (Ed. Code, § 35330, subd. (d), italics added.)

Moreover, if the road trip was not a field trip or excursion related to LHS's girls' basketball program, the district would still be immune from liability under Government Code section 815, subdivision (a). Assuming the trip was an entirely private enterprise, neither Barfield nor Allen would have been acting within the scope of employment or as defendants' agents. The road trip would have constituted a private, independent venture for which the district, as a matter of law, is immune from liability under the California Tort Claims Act.

We conclude the record demonstrated, as a matter of law, the complete absence of any basis for holding the district liable for plaintiffs' off-campus injuries. Accordingly, summary judgment was properly entered for the district.

---

to go on the road trip. For purposes of this appeal, we will assume the school permitted the girls to take the trip and miss excessive days without being dropped from summer school. Allowing students to miss summer school to take a privately planned trip without loss of class credit is not the same as providing class credit for taking the trip. The school's decision not to drop the girls from summer school did not transform the trip into a school sponsored activity for which attendance was required.

[12]Plaintiffs briefly suggest in their opening brief, without benefit of supporting legal authority or analysis, that the trial court erred in excluding the declaration of Dr. Harold Cebrun, who was LHS's assistant principal from August 1982 through July 1984. In his declaration, Cebrun opined that the district was liable for the accident because the trip was a school-sponsored activity that the district had subsequently ratified by paying its employees' postaccident travel expenses. Obviously, Cebrun was no longer employed at LHS when the accident occurred in 1994 and had no personal knowledge of the facts. The trial court sustained the district's objections of lack of personal knowledge and hearsay. We conclude the trial court correctly excluded the declaration that, in any event, would have been useless in assisting the court to decide the legal question of the district's potential liability for the accident.

## The City's Liability

█ Allen was a city employee at the time of the accident. Under Government Code section 815.2, subdivision (a) the city is liable for an "injury proximately caused by an act or omission of [its] employee . . . within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Plaintiffs contend the city is potentially liable for Allen's negligence in the scope of her part-time employment with the city's recreation and parks department. The record fails to establish, however, a triable issue of fact as to whether Allen was acting in the scope of her city employment while driving the van. Allen's part-time, hourly position with the city required her to report for her shifts at Hamilton Park, not drive the van for the Running Rebels. Without informing the city in advance, Allen went on the road trip, missed her daily shift assignments without her supervisor's approval or knowledge, forfeited her pay, and required her supervisor to rearrange the shift schedule at the last minute when it became apparent that Allen's absence would extend for several weeks. Accordingly, the record does not support plaintiffs' contention that the city is potentially liable for their injuries by virtue of Allen's municipal employment status.

Plaintiffs also contend the city's payment of the bulk of the team's trip expenses rendered the city potentially liable for Barfield's and Allen's negligence in planning and executing the trip. The record shows, however, that the city undertook no responsibility for and exercised no control over the team or the planning, scheduling, or execution of the trip. When the city council agreed at the July 5 meeting to pay the team's vendors, the schedule had already been determined by Barfield with no input from the city. Although the city required the team to submit an itemized expense list to permit individual city checks to be made out to each vendor, that was done solely to ensure fiscal responsibility and accountability.

Having exerted no control over the team or the planning, scheduling, or execution of the trip, the city may not, as a matter of law, be held potentially liable for plaintiffs' injuries. (See *Mann* v. *Nutrilite, Inc.* (1955) 136 Cal.App.2d 729, 735 [289 P.2d 282] [nonsuit for the defendant corporate financial sponsor of a girls' softball team was granted because the sponsor had exerted no control over the team and, thus, could not be held vicariously liable for injuries sustained when a softball hit a team chaperone during a warm-up session].) Like the court in *Mann* v. *Nutrilite, Inc.,* we distinguish *Bonetti* v. *Double Play Tavern* (1954) 126 Cal.App.2d Supp. 848 [274 P.2d 751], in which the defendant sponsor of a semiprofessional baseball team exerted control over the team by, among other things, selecting the team's

manager and purchasing uniforms imprinted with the defendant's name. Here, on the other hand, the city exerted no control and made no decisions regarding the Running Rebels' road trip, coaching staff, uniforms, or schedule. The city simply donated $10,000 to help cover the bulk of the team's expenses, demonstrating a "commendable interest . . . in the youth activities of the community" for which no liability may attach. (*Mann* v. *Nutrilite, Inc., supra,* 136 Cal.App.2d at p. 736.) Accordingly, summary judgment was properly entered for the city.

## DISPOSITION

We affirm the summary judgments for defendants city and district. Defendants are awarded their costs on appeal.

Spencer, P. J., and Masterson, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 20, 1999.