John ROE, a minor, by and through his Guardian ad Litem, Sheila Irene CALLAHAN, Plaintiff,

v.

GUSTINE UNIFIED SCHOOL DISTRICT; Golden Valley Unified School District; Kyle Matthew Fischer, aka Kyle Simmons, a minor; Kelly Simmons; Jason Simmons; Matthew McKimmie, a minor; Myrna Tyndal; Tommy San Felipo, a minor; Frank Hudson; Betty Hudson; Carl Scudder; Jason Spaulding; Anthony Souza; Adam Cano; Timothy Hayes; Kuljeep Mann; Chris Imperatrice; and Does 1–200, Defendants.

No. 1:07–CV–00796–OWW–SMS.

United States District Court,
E.D. California.

Dec. 22, 2009.

Kimberly Gail Flores, Terry L. Allen, Allen, Fagalde, Albertoni & Flores, LLP, Merced, CA, for Sheila Irene Callahan.

Michael Fischer, Los Banos, CA, pro se.

Jason Simmons, Los Banos, CA, pro se.

Kelly Simmons, Los Banos, CA, pro se.

Matthew McKimmie, Gustine, CA, pro se.

Myrna Tyndal, Gustine, CA, pro se.

Tommy Sanfilippo, Gustine, CA, pro se.

Betty Hudson, Gustine, CA, pro se.

Frank Hudson, Gustine, CA, pro se.

James F. McBrearty, Tuttle & McCloskey, Fresno, CA, for Carl Scudder.

Jeffrey R. Olson, M., McCormick, Barstow, Sheppard, Wayte & Carruth, Modesto, CA, Mart Benjamin Oller, IV, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, CA, for Jason Spaulding, Anthony Souza, Adam Cano, Gustine Unified School District.

Paul Auchard, Auchard & Stewart, Fresno, CA, for Timothy Hayes, Kuljeep Mann, Chris Imperatrice, Golden Valley Unified School District.

MEMORANDUM DECISION RE DEFENDANTS GUSTINE UNIFIED SCHOOL DISTRICT, JASON SPAULDING, ANTHONY SOUZA, AND ADAM CANO'S MOTION FOR SUMMARY JUDGMENT (Doc. 96) AND DEFENDANT CARL SCUDDER'S MOTION FOR SUMMARY JUDGMENT (Doc. 91.)

OLIVER W. WANGER, District Judge.

## I. *INTRODUCTION*

This case arises from alleged student-on-student harassment of Plaintiff John Roe while he was attending a football camp at Liberty High School in July 2006. In July 2006, Plaintiff was an incoming freshman at Gustine High School, who intended to play football for Gustine High in the fall of 2006. Plaintiff attended a football camp jointly coordinated by Gustine and Liberty High Schools. While at football camp, Plaintiff was assaulted by several upper class teammates, and suffered additional acts of hazing by these individuals.

The defendants are the Gustine and Golden Valley Unified School Districts, Gustine High School football coaches, the individuals who allegedly perpetrated these events, and the parents of the minors allegedly involved in these events.

On May 31, 2007, Sheila Irene Callahan, as guardian ad litem for John Roe,[1] a minor, the real party in interest, filed this action against defendants under 20 U.S.C. section 1681–1688 ("Title IX") and 42 U.S.C. § 1983, as well as various state law tort claims. Plaintiff contends that the school districts and their employees violated Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.*, by being deliberately indifferent to the alleged harassment. Plaintiffs' claim for relief under 42 U.S.C. § 1983 is based on an alleged equal protection violation under U.S. Constitutional Amendment XIV.

Plaintiff's state law claims against the school districts and its employees relate to their negligent failure to supervise the students under their custody and control.

Before the court are motions for summary judgment filed by Defendants Gustine Unified School District, Jason Spaulding, Anthony Souza, and Adam Cano (collectively "School District Defendants") and Defendant Carl Scudder ("Scudder") (all collectively "Defendants").[2] Defendants' motions seek summary judgment as to all of Plaintiff's claims against Gustine Unified School District or School District employees.

---

1. John Roe is the pseudonym for the Plaintiff, who was fourteen years old during the incidents giving rise to this litigation.

2. District Defendants and Scudder filed separate motions for summary judgment. Due to the overlapping facts and issues presented by these motions, all Defendants' motions are addressed together.

## II. FACTUAL BACKGROUND

Because all material facts must be viewed in the light most favorable to the non-movant, they are accepted as true. The parties' submissions present the following facts: [3]

### A. The Parties

At all relevant times, Plaintiff, John Roe, was a minor, under the age of eighteen years. (Compl. ¶ 5.) Sheila Callahan is the biological mother of John Roe, and both reside in Glendale, Arizona. (Compl. ¶ 5.)

Gustine Unified School District ("GUSD") was a public school district in the County of Merced. (Compl. ¶ 6.) Gustine High School ("GHS") was a subordinate entity under GUSD. (Id.) Defendants Carl Scudder, Jason Spaulding, Anthony Souza, and Adam Cano (collectively "Individual GUSD Defendants") are employees of a GUSD and/or Gustine High School. (Compl. ¶ 7.)

Golden Valley Unified School District ("GVUSD") was a public school district in the County of Madera. (Compl. ¶ 8.) Liberty High School ("LHS") was a subordinate entity under GVUSD. (Id.) Defendants Hayes, Mann, and Imperatrice (collectively "Individual GVUSD Defendants") are employees of a GVUSD and/or Liberty High School. (Compl. ¶ 9.)

Defendants Kyle Simmons and Michael Simmons were minors residing in the County of Merced. (Compl. ¶ 10.) Defendants Kelly Simmons and Jason Simmons are the biological parents of Kyle Simmons and Michael Simmons. (Id.)

Defendant Matthew McKimmie is a minor residing in the County of Merced. (Compl. ¶ 11.) Defendant Myrna Tyndal is the biological mother of Matthew McKimmie. (Id.)

Defendant Tommy San Felipo is a minor residing in the County of Merced. (Compl. ¶ 12.) Defendants Frank Hudson and Betty Hudson are the legal guardians of Tommy San Felipo. (Id.)

In July 2006, Kyle Simmons, Michael Simmons, Matthew McKimmie, and Tommy San Felipo were upperclassmen on the Gustine High School football team. It is undisputed that Kyle Simmons and Michael Simmons were reprimanded by GHS administrators for behavioral issues prior to the July 2006 football camp, including having their interdistrict transfers suspended or revoked. (Scudder Dep. 117:3–117:25.) Coach Scudder was aware of the suspension prior to the July 2006 football camp. (Id.)

### B. The July 2006 Football Camp

On July 13th through July 15th, 2006, Gustine High School and Liberty High School held a contact football camp at Liberty High School. (PSUF 20.) The camp was organized and planned by Defendants Chris Imperatrice, head football coach at LHS, and Carl Scudder, head football coach at GHS. (PSUF 35.) GHS and LHS football players and coaches participated in a similar camp in the summers of 2004 and 2005. (PSUF 36.) There were no reported incidents of hazing or sexual harassment in 2004 or 2005.

Approximately 60 GHS players attended the 2006 football camp, which was a desig-

---

**3.** Unless otherwise noted, the facts are undisputed. Along with his opposition, Plaintiff filed a "Statement of Disputed/Undisputed Facts in Opposition to Defendants Motions for Summary Judgment," ("PSUF"). Defendants Gustine Unified School District, Jason Spaulding, Anthony Souza, and Adam Cano filed a "Statement of Undisputed Facts in Support of Motion for Summary Judgment," ("DSUF"), on April 30, 2009, as did Defendant Carl Scudder, ("Scudder SUF").

nated "Play Day" event under California Interscholastic Federation ("CIF") rules.[4] (PSUF 39–40.) Attendance at the football camp was voluntary and players did not receive school credit for their attendance.[5] (DSUF 4–5; Scudder SUF 3–4.) GHS students were transported to and from the Camp by two buses that were owned and operated by GUSD. (PSUF 51, 63.) Use of the buses and participation in the camp was requested in advance by Scudder and approved by Dennis Shaw, the Principal of GHS. (PSUF 52.)

The only requirements for students to be eligible to participate in the camp were 1) that the students (or their parents) sign a Liability Waiver for LHS, 2) that they pay $25 or receive a hardship waiver, and 3) that they attend 40 hours of football practice prior to the camp. (PSUF 44–45.) It is undisputed that Plaintiff signed the waiver, paid the fee, and attended the required 40 hours of practice prior to July 13, 2006.[6]

The GHS players and coaches slept in the LHS gym Thursday and Friday nights, while the LHS players left campus each night after camp activities. During the Camp, all coaches for GHS and LHS were responsible for supervising the students while on the field and during combined activities. (PSUF 40–43.) The four GHS coaches were responsible for supervising the 60 GHS students while off the field, during break, meal and rest periods, and overnight while in the gym.[7] (PSUF 41–42.) No other adults were charged with supervising the GHS students during the camp. (PSUF 42.)

## C. Hazing Incidents

### 1. The Air Pump Incident

On the second day of camp, Plaintiff was assaulted by a group of GHS upperclassmen, Kelly Simmons, Michael Simmons, Matthew McKimmie, and Tommy San Felippo. The group chased Plaintiff into the LHS locker room, held him down, and then inserted a battery-controlled air pump into his rectum. (Pl. Dep. 188:11–191:10.) The group then activated the pump, inserting air into Plaintiff's rectum for a few seconds. (Id. 194:25–196:3.) According to Plaintiff, the attack occurred in the presence of several LHS students, who did not end the assault. (Id. 196:4–196:22.) Plaintiff also witnessed these individuals assault several other teammates with the air pump during the football camp. (Id. 179:4:181:11.)

It is undisputed that Kelly Simmons, Michael Simmons, Matthew McKimmie, and Tommy San Felippo assaulted or attempted to assault with an air hose approximately fifteen players during the July 2006 football camp.

### 2. The Shower Incident

On the second day of camp, following the assault, Plaintiff took a shower in the boys' locker room. (Id. 204:12–204:22.) While Plaintiff was in the shower, San

---

**4.** According to Coach Scudder, the Camp was intended to be "an opportunity for an individual to improve his football skills and for a team to improve their cohesion and ability to play together." (Scudder Dep. 69:20–69:23.)

**5.** GHS and LHS athletics are governed by the California Interscholastic Federation. In 2006, a CIF rule classified the off-season to include the time period of July 13–15, 2006, and identified an "out of season," organized recreational activity involving teams from two

or more high schools, such as the subject Camp, as a "Play Day" event. (PSUF 38–39)

**6.** At time of camp, it is undisputed that GUSD had policies prohibiting sexual harassment and gender harassment/discrimination. (DSUF 8.)

**7.** It is undisputed that Coach Cano left Liberty High School and returned home following the first evening practice.

Felippo, without any clothes on, entered the shower area and proceeded towards Plaintiff, who was in the corner of the shower area. San Felippo grabbed Plaintiff's shoulders from behind and Plaintiff pushed him away. (*Id.* 206:3–207:6.) According to Plaintiff, San Felippo, in an effeminate tone, called Plaintiff a homosexual and grabbed his buttocks. (*Id.* 207:13–209:12.) San Felippo then left the shower area. (*Id.*)

### 3. *The Pillow Fight*

On the second night of camp, the players engaged in a pillow fight. Based on the record, the pillow fight was a yearly ritual, with no prior incidents of abuse or violence. Coach Scudder approved of the pillow fight and several of the coaches were present in the gym for the pillow fight.

According to Plaintiff, the pillow cases were filled with baby powder, football equipment, and other heavy objects. (PSUF 73.) The players then used the filled pillow cases to attack their teammates. (*Id.*) Plaintiff states that he sat next to one of the GHS coaches during the pillow fight in the hopes that he would be protected. (PSUF 72.) Sensing that he would be attacked anyway, Plaintiff engaged in the pillow fight. (*Id.*) According to Plaintiff, he was then hit in the head and face with the pillow cases stuffed with heavy objects. (PSUF 73.) Plaintiff states that he suffered injuries as a result of the blows. (PSUF 71–75.)

According to Scudder, the players were not required to participate in the pillow fight. (Scudder Dep. 172:8–172:14.) Scudder stated that several players sat near their bunks, opting not to participate in the pillow fight. (*Id.*) Neither Scudder nor the assistant coaches witnessed any players put anything into their pillow cases.

The assistant coaches also did not report any injuries stemming from the pillow fight, other than Nathan Xavier, who had a bloody nose. (Scudder Dep. 174:9–174:19.) According to Scudder, Mr. Xavier had a bloody nose earlier in the day. (*Id.*)

### 4. *Flashing Incidents*

According to Plaintiff, during practice at GHS and during the 2006 Camp, the Simmons twins and San Felippo repeatedly exposed their genitals to other GHS players both on and off the field. (PSUF 76–78.) Plaintiff states that San Felippo repeatedly exposed his genitals, and would "slap" players on the head and face with his penis. (*Id.*) According to Plaintiff, he was one of the many victims of this conduct. (*Id.*)

It is undisputed that Plaintiff did not report this behavior to Coach Scudder or any of the assistant football coaches.

There is no evidence that Coach Scudder or any other Gustine high coach witnessed or otherwise knew of any of any players exposing their genitals.

### 5. *Verbal Harassment at Camp*

According to Plaintiff, he suffered from repeated sexual harassment by the upperclassmen after the air pump incident. Plaintiff states that he was called homosexual epithets, "resulting in a collective belief among the other GHS players that Plaintiff was a homosexual." (PSUF 80.)

It is undisputed that Plaintiff did not report this behavior to Coach Scudder or any of the assistant football coaches.

There is no evidence that Coach Scudder or any other Gustine employees witnessed or otherwise knew that any players used homosexual epithets.

### D. *Knowledge of Hazing Events*

During the Camp, Coach Scudder observed a group of upperclassmen run

across the gym in the direction of a teammate, Kevin St. Jean, who was sitting on his air mattress. (Scudder Dep. 152:6–152:16.) According to Scudder, the group, Kyle and Michael Simmons, San Felippo, McKimmie, and Felix Figueroa, pinned St. Jean's arms to his side and blew air up the leg of his shorts, near his thigh. (*Id.*) St. Jean was sitting upright on his air mattress during the incident, never in a spread eagle position. (Scudder Dep. 153:8–153:12.) Scudder yelled at the group to stop, verbally reprimanding them and their "horseplay." (*Id.*) Coach Scudder then confiscated the air pump and kept it for the duration of the camp. (Scudder Dep. 153:16–153:18.)

Coach Souza was also present in the gym during the football camp, supervising the players. There is no evidence that Souza witnessed or otherwise knew of any of the events described above.

Unless specifically noted, there is no evidence that Coach Scudder or any other Gustine high coach witnessed or otherwise knew of any of the events described above.

E. *Conduct after Camp*

The Camp concluded on Saturday, July 15, 2006. (PSUF 20.) The GHS coaches and players next met for practice on Tuesday, July 18, 2006. Plaintiff returned to football practice on July 18, 2006. (DSUF 12.) Coach Scudder was out of town the week after the Camp so Coach Cano ran the practice in his absence. During one of the practices, Coach Cano overhead one of the players talking about what was done to Plaintiff during the Camp. The next day, Coach Cano called Dennis Shaw, the Principal of GHS, and told him he needed to speak with him about behavior at the Camp. A few days later, the two spoke and set up a meeting to review the incidents.

On Monday, July 24, 2006, Dennis Shaw contacted the Gustine Police Department and Coach Scudder. Principal Shaw, Coach Scudder, Coach Cano, and an officer with the Gustine Police Department met on July 25, 2006 to discuss the events of July 13 through July 15, 2006.

On September 12, 2006, GUSD initiated expulsion proceedings against the Simmons twins, McKimmie, and San Felippo.

III. *PROCEDURAL BACKGROUND*

On May 30, 2007, Plaintiff filed a complaint against Gustine and Golden Valley Unified School Districts, Gustine High School football coaches, the individuals who allegedly perpetrated these events, and the parents of the minors allegedly involved in these events. (Doc. 1.) The complaint set forth fifteen causes of action: (1) violation of statutory rights under Title IX, 20 U.S.C. §§ 1681–1688 against the School District Defendants and their employees; (2) violation of civil rights under 42 U.S.C. § 1983 against the School District Defendants and their employees; (3) sexual battery against the individual Defendants; (4) assault and battery against the individual Defendants; (5) intentional infliction of emotional distress against all defendants; (6) violation of Cal. Constitution, art. 1, § 7(a) against the School District Defendants and their employees; (7) violation of Cal. Civil Code § 52.4 against all defendants; (8) violation of Cal. Civil Code § 51 against the School District Defendants and their employees; (9) violation of Cal. Civil Code § 51.7 against the School District Defendants and their employees; (10) sex discrimination under the Cal. Education Code against the School District Defendants and their employees; (11) vicarious liability of Parent/Guardian for willful acts of a minor; (12) negligent supervision;[8] (13) negligence per se

---

8. The complaint includes two negligent super- vision causes of action: the first against the

against School District Defendants and their employees; and (14) negligent training against School District Defendants.

Defendants filed their answers to Plaintiff's complaint on August 8, 2007. (Docs. 33, 35.)

Defendants filed their motions for summary judgment on April 30, 2009. (Docs. 91, 96.) Defendants seek judgment on the following grounds: 1) Defendants are immune from Plaintiff's federal and state causes of action pursuant to California Education Code § 35330; 2) Plaintiff's section 1983 claims are barred by the Eleventh Amendment; 3) Plaintiff's evidence is insufficient to create a genuine issue of material fact under Title IX; and 4) Plaintiff's gender violence cause of action lacks merit.

Plaintiff filed his opposition to Defendants' summary judgment motions on July 27, 2009. (Doc. 107.) In support of his opposition, Plaintiff submitted a single Memorandum opposing all the motions ("Memorandum").

Plaintiff argues that Defendants are not immune under any provision of the California Education Code because the football camp was not a "field trip" or "excursion" under Cal. Ed.Code § 35330. Plaintiff also asserts that a state law immunity is incapable of providing a basis to defeat Plaintiff's federal causes of action.

As to Defendants' arguments concerning liability under federal law, Plaintiff argues that the Eleventh Amendment does not bar § 1983 claims against Scudder, Cano, Spaulding, and Souza in their individual capacities. Plaintiff also argues that there are triable issues of material fact as to his Title IX claim against GUSD.

In his opposition, Plaintiff conceded he cannot prevail on the following state law claims against the moving Defendants: (1) Plaintiff's seventh and ninth causes of action based on Gender Violence.[9] (Doc. 107, 7:17–7:19.)

Plaintiff also concedes the following federal claims: (1) Plaintiff's Title IX claim for sexual discrimination and harassment against the individual moving Defendants; and (2) Plaintiff's § 1983 claim against GUSD and the individual moving defendants, in their official capacity only. (Doc. 107, 7:23–7:26.)

## IV. LEGAL STANDARD

### A. Summary Judgment/Adjudication

Summary judgment, or summary adjudication, is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty

School Districts and their employees (Count XIII), the second against the parents/guardians of the minor defendants (Count XIV).

9. Accordingly, summary adjudication is GRANTED in favor of Defendants as to Plaintiff's seventh and ninth causes of action for gender violence.

*Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the non-moving party's case." *Soremekun,* 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun,* 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir. 2009). "[A] non-movant must show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor." *Id.* (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In determining whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

## V. DISCUSSION

To determine the scope of the federal actions that may be considered as part of the Plaintiff's case, the first inquiry addresses Defendants' arguments that they are immune from liability for Plaintiff's federal claims under Cal. Educ.Code § 35330.

### A. Immunity Under California Education Code § 35330

Defendants argue that Cal. Educ.Code § 35330, subsection d, disposes of Plaintiff's entire action. Specifically, Defendants contend that Plaintiff's claims, both federal and state, are barred by Cal. Educ. Code § 35330(d), which provides immunity to school districts, charter schools and the State of California for injuries occurring during a "field trip" or "excursion." Section 35330(d) provides:

> All persons making the field trip or excursion shall be deemed to have waived all claims against the district, a charter school, or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion.

Plaintiff disputes Defendants' broad interpretation of California's field trip immunity. Plaintiff maintains that § 35330(d) is "limited to claims for injury, accident, illness, or death occurring during or by reason of the field trip or excursion ... [b]oth Title IX and 1983 suits are civil rights actions—not personal injury actions." (Doc. 107, 18:13–18:15.) Plaintiff argues that even if the field trip immunity applies, "the field trip immunity would affect only state law causes of action and not any federal or constitutional claims." (Doc. 107, 18:10–18:11.)

The motion presents a question of law largely unrelated to the facts of this case: does Cal. Educ.Code § 35330(d), a state immunity statute, immunize Defendants from Plaintiff's federal civil rights claims?

Pursuant to 42 U.S.C. § 1988, if a civil rights statute is "deficient in the provisions necessary to furnish suitable remedies," the court is to look to state law. 42 U.S.C. § 1988. This rule is "subject to the impor-

tant proviso that state law may not be applied when it is inconsistent with the Constitution and laws of the United States." *Robertson v. Wegmann*, 436 U.S. 584, 590, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (internal quotations omitted). The Supreme Court has identified the purposes behind the Federal Civil Rights Act: (1) to prevent official illegality, *Robertson*, 436 U.S. at 592, 98 S.Ct. 1991, and (2) to "compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

Defendants argue that § 35330(d) is consistent with federal law and "provides guidance on a unique situation not contemplated by federal legislation." (Doc. 96, 8:9–8:11.) Defendants assert that "without consideration of § 35330 with respect to Plaintiff's federal claims, the law is not adapted to the object as is required by 42 U.S.C.1988(a)." (*Id.*) Defendant cites a number of federal decisions for the proposition that "federal courts are expressly authorized to adopt state law to define the scope of federal claims, including 42 U.S.C. 1983."

Defendants rely on *Provencio v. Vazquez*, No. 1:07–CV–0069–AWI–TAG, 2008 WL 3982063 (E.D.Cal., August 18, 2008), to assert that § 35330(d) is consistent with the Constitution and the Federal Civil Rights Act, permitting adoption of § 35330 to define the scope of the federal claims at issue in this litigation. *Provencio* is distinguishable. Unlike this case, the issue in *Provencio* was whether a state survival statute barring recovery of a decedent's pain and suffering was contrary to the compensation and deterrence purposes of § 1983.[10] *Provencio* found:

The deterrent purpose of Section 1983 is satisfied by the fact that Section 377.34 allows the estate to recover the punitive damages the decedent would have been entitled to recover had he survived. Unfortunately, once deceased a decedent cannot in any practical way be compensated for his injuries or pain and suffering, or be made whole. However, the statutory scheme for survivors in California still provides compensatory damages for the remaining injured parties, i.e. the survivors. California law provides for not only recovery by the representative of the estate but also for a wrongful death action by the decedent's heirs. Thus, this court finds that the Estate's claims for pain and suffering damages and hedonic damages are precluded by Section 377.34.

*Id.* at *12 (citations omitted).

■ Defendants reliance on *Provencio* is misplaced. Because California's statutory scheme still provided for recovery by the representative of the estate and for a wrongful death action by the decedent's heirs, *Provencio* found that § 377.34 was not inconsistent. In this case, the application of § 35330(d) completely eliminates any potential remedy for Plaintiff under § 1983 and Title IX. Barring recovery is inconsistent with Supreme Court precedent and the legislative intent that protection of federal civil rights be encouraged. *See Felder v. Casey*, 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) ("the central objective of the Reconstruction–Era civil rights statutes ... is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive re-

---

**10.** The Ninth Circuit has not specifically addressed this issue. *But cf. Gotbaum v. City of Phoenix*, 617 F.Supp.2d 878, 884 (D.Ariz. 2008) (stating "[m]ost courts have concluded that state statutes limiting civil remedies in cases where a constitutional violation has caused death to the victim simply are not consistent with the purposes of section 1983.").

lief.") (citation omitted). Defendants' attempt to apply or expand the holding of *Provencio* fails.

*Good v. Dauphin County Social Services for Children and Youth,* 891 F.2d 1087 (3d Cir.1989), is analogous. In Good, a mother suspected of child abuse brought a civil rights action against municipal and county officials who allegedly conducted an improper search of her home. Defendants moved for summary judgment under Pennsylvania's Child Protective Services Law—11 Pa. St. Ann. § 2211—which "specifically granted immunity to those carrying out its provisions." [11] The District Court granted summary judgment on grounds that 11 Pa. St. Ann. § 2211 immunized Defendants for any violation of Plaintiffs' Fourth Amendment rights. The Third Circuit reversed:

> A state immunity statute, although effective against a state tort claim, has no force when applied to suits under the Civil Rights Acts. The supremacy clause of the Constitution prevents a state from immunizing entities or individuals alleged to have violated federal law. This result follows whether the suit to redress federal rights is brought in state or federal court. Were the rule otherwise, a state legislature would be able to frustrate the objectives of a federal statute.

*Id.* at 1091, citing *Wade v. City of Pittsburgh,* 765 F.2d 405, 407–408 (3d Cir.1985).

Supreme Court and Ninth Circuit precedent is consistent with *Good.* In *Martinez v. State of California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), Defendant Parole Board Officials were dismissed (federal and state claims) by the trial court under a California statute conferring immunity on officials responsible for parole decisions. *Id.* The Supreme Court found that "the California immunity statute does not control this claim even though the federal cause of action is being asserted in state courts:"

> "Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. The immunity claim raises a question of federal law."

*Martinez,* 444 U.S. at 284, 100 S.Ct. 553 (citations omitted).

The Supreme Court recently reaffirmed this well-established principle in *Haywood v. Drown,* —— U.S. ——, 129 S.Ct. 2108, 2131, 173 L.Ed.2d 920 (2009): "permitt[ing] a state immunity defense to have controlling effect over a federal claim violates the Supremacy Clause."

The Ninth Circuit recognizes that "state law cannot provide immunity from suit for federal civil rights violations." *Wallis v. Spencer,* 202 F.3d 1126, 1143–44 (9th Cir. 2000); *Romstad v. Contra Costa County,* 41 Fed.Appx. 43 (9th Cir.2002). In *Romstad,* the Ninth Circuit found that the district court erred by applying California Government Code § 820.2, a state immunity statute, to the Romstads' federal claims: "immunity under § 1983 is governed by federal law; state law cannot provide immunity from suit for federal civil rights violations." *Id.* at 46.

---

**11.** 11 Pa. St. Ann. § 2211: "Any person, hospital, institution, school, facility or agency participating in good faith in the making of a report, cooperating with an investigation or testifying in any proceeding arising out of an instance of suspected child abuse ... shall have immunity from any liability, *1091 civil or criminal, that might otherwise result by reason of such actions."

Defendants simply ignore federal law concerning the application of state law immunities to federally created statutory rights. In his reply brief, Defendant Scudder states "[i]f the court were to limit the reach of Education Code § 35330(d) to the state law claims only, this would fly in the face of the clear intent of the [California] legislature to financially protect school district and their employees." This turns the law on its head. Defendants' arguments "fly in the face" of the Supremacy Clause and clearly established Supreme Court and Ninth Circuit law that federal not state law is supreme.

Congress sought to provide an effective remedy for federal violations, to do so Supreme Court and Ninth Circuit precedent expressly abrogate conflicting state law immunities in federal civil rights cases. The application of the California "field trip immunity" statute is inconsistent with purposes of the Civil Rights Act. Section 35330(d) does not preclude a specific form of damages as did the survival statute in *Provencio*. In this case, if applied, § 35330(d) completely immunizes defendants from liability resulting from a violation of federal law and defeats the federal civil rights act.

Even assuming, *arguendo*, that § 35330(d) is applicable to this case, the California "field trip immunity" cannot immunize Defendants from liability resulting from a violation of superceding federal law, only, if applicable, for state law claims.

### B. *Section 1983*

Plaintiff's Complaint alleges that Defendants' actions are prohibited by 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution. The Complaint states that "Defendants intentional acts or omissions [ . . . ] caused a deprivation of Plaintiff's right to equal protection because as a male victim of sexual abuse and sexual harassment, discrimination and violence by other males, Plaintiff was intentionally treated differently from female victims of sexual abuse and sexual harassment." (Compl. ¶ 56.)

"Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

### 1. *Gustine Unified School District*

In *Belanger v. Madera Unified School Dist.*, 963 F.2d 248, 251 (9th Cir.1992), the Ninth Circuit held that a California school district was a state agency for purposes of the Eleventh Amendment. *Belanger* is premised on a number of significant facts; California school districts have budgets that are controlled and funded by the state government rather than local districts, California law treats public schooling as a statewide or central government function, and California school districts can sue and be sued in their own name. *Id.* at 251–54; *see also Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1577 (N.D.Cal.1993) ("California School districts are arms of the state for purposes of Eleventh Amendment immunity and are therefore immune from liability under section 1983").

Defendant Gustine Unified School District argues that it is an arm of the state for purposes of Eleventh Amendment immunity, entitling it to summary adjudication. (Doc. 96–2, 9:18–9:20.) Plaintiff does not oppose Defendant's motion, abandoning the § 1983 cause of action against Defendant Gustine Unified School District. (See Doc. 107, 7:25–7:27. (stating Plaintiff

"concede[s] dismissal of the following claims: Plaintiff's 42 U.S.C.1983 claim against GUSD ....]".)

Summary adjudication is GRANTED in favor of Defendant Gustine Unified School District against Plaintiff as to Plaintiff's § 1983 claim.

### 2. *Individual Defendants Sued in their Official Capacities*

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. It is no different from a suit against the State itself." *Will,* 491 U.S. at 71, 109 S.Ct. 2304.

Individual District Defendants move for summary adjudication as to Plaintiff's § 1983 claim against them in their official capacities. (Doc. 96, 10:7–10:16; Doc. 91, 9:14–9:22.) Plaintiff does not oppose Individual District Defendants' motions, abandoning the § 1983 "official capacity" cause of action. (See Doc. 107, 7:25–7:27 (stating Plaintiff "concede[s] dismissal of the following claims: Plaintiff's 42 U.S.C.1983 claim against [...] Defendants Scudder, Cano, Spaulding, and Souza, in their official capacit[ies].".)

Summary adjudication is GRANTED in favor of moving Defendants as to Plaintiff's § 1983 claims against Defendants Scudder, Cano, Spaulding, and Souza, in their official capacities.

### 3. *Individual Defendants Sued in their Personal Capacities*

 Defendants first argue that the Complaint "does not allege that the Indi-

vidual Defendants are being sued for violations under Section 1983, in their personal capacity." However, when a § 1983 complaint is ambiguous or unclear as to the capacity in which an official is being sued, as is the case here, it is presumed that he is being sued in his personal capacity. *See, e. g., Romano v. Bible,* 169 F.3d 1182, 1186 (9th Cir.1999) (noting courts "presume[s] that officials necessarily are sued in their personal capacities where those officials are named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued"); *Shoshone–Bannock Tribes v. Fish & Game Comm'n,* 42 F.3d 1278, 1284 (9th Cir.1994) (stating "[w]here state officials are named in a complaint which seeks damages under Section 1983, it is presumed that the officials are being sued in their individual capacities. Any other construction would be illogical where the complaint is silent as to capacity, since a claim for damages against state officials in their official capacities is plainly barred.") (citation omitted).

While the Complaint does not name the Individuals Defendants in their "individual capacities," the Complaint clearly asserts individual capacity claims by specifically naming each Individual Defendant and requesting actual, compensatory, statutory, and punitive damages based on the coaches' personal involvement.[12] Defendants' first argument is insufficient to summarily adjudicate Plaintiff's § 1983 claim in favor of Individual Defendants. However, Individual Defendants advance an alternative argument for summary adjudication,

---

**12.** The Complaint does not specifically identify, in the caption or otherwise, whether the Individual Defendants are sued in their "official," "personal," or "individual" capacities. (See Compl. ¶ 7, 9, 13.) However, the Complaint alleges that Defendants "were acting within the course and scope of employment at GUSD and/or Gustine High School," and

"had the authority to institute corrective measures, were aware of the harassment, yet repeatedly and intentionally failed to take the appropriate or necessary measures to prevent or stop the abuse suffered by Plaintiff." (*Id.* at 13.) The Complaint also requests actual, compensatory, statutory, and punitive damages. (*Id.* at 131.)

namely that each coach is "shielded from the liability by the doctrine of qualified immunity." (Doc. 96–2, 10:24–10:28.)

◼ Suits against government officials in their individual or personal, rather than official capacities, are not barred by the Eleventh Amendment. *Price v. Akaka,* 928 F.2d 824, 828 (9th Cir.1990). However, the doctrine of qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law ...." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

◼ In analyzing a claim of qualified immunity, there are two inquiries: "First, we inquire whether, taken in the light most favorable to the party asserting the injury, that party has established a violation of a federal right. Assuming this threshold inquiry is satisfied, we consider whether the School Officials' conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Preschooler II v. Clark County Bd. of Trs.,* 479 F.3d 1175, 1179–80 (9th Cir.2007) (internal quotations and citations omitted). While this sequence is "often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

Plaintiff alleges a claim for violation of his right to equal protection, contending that the Individual Defendant's actions were driven by gender discrimination. The Complaint alleges generally that employees of GUSD "have enforced and do enforce policies and procedures to prevent and/or remedy female students and female student athletes from male-on-female sexual abuse and sexual harassment, discrimination, and violence." (Compl. ¶ 49.) More particularly, Plaintiff alleges that "Defendants intentionally failed to take appropriate disciplinary or remedial measures to address the ongoing harassment, intimidation, assault, battery, and retaliation because of Plaintiff's gender and the male-on-male nature of the sexual abuse and harassment." (*Id.*)

◼ The Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Denials by any person acting under color of state law are actionable under § 1983. In order to establish a § 1983 equal protection violation, Plaintiff must show that the Individual Defendants, acting under color of state law, discriminated against him as a member of an identifiable class and that the discrimination was intentional. *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1134 (9th Cir.2003).

An equal protection claim turns on proof that the defendant "acted in a discriminatory manner and that the discrimination was intentional." *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir. 2000) (citation omitted). A "long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive." *Navarro v. Block,* 72 F.3d 712, 716 (9th Cir.1995) (emphasis in original; citations omitted). To preserve his equal protection claim, Plaintiff needs evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the individual defendants' conduct was motivated by gender discrimination. *See, e.g., Bingham v. City of Manhattan Beach,* 341 F.3d 939, 948–49 (9th Cir.2003).

Plaintiff does not specifically address equal protection. Plaintiff states "the

Eleventh Amendment immunity does not bar claims against Scudder, Cano, Spaulding, and Souza in their individual capacities. In that respect summary judgment should be denied [ . . . . ]" (Doc. 107, 25:15–25:19.) Plaintiff does not identify specific evidence that the Defendants denied protection to GHS male students that it afforded similarly situated female students. Nor is there evidence that his coaches acted with gender animus.

■ Plaintiff has the burden to establish his equal protection allegations. *See Reese*, 208 F.3d at 740 ("To succeed on a § 1983 equal protection claim, the plaintiffs must prove that the defendants acted in a discriminatory manner and that the discrimination was intentional.") (citation omitted). The record is devoid of evidence of gender discrimination other than the allegations the Complaint's conclusory allegations that sexual harassment policies were applied differently based on gender. Pleadings are insufficient to oppose summary adjudication. *See Ross v. Hoeft*, No. 07–17369, 2009 WL 3748187 *1 (9th Cir. Nov. 10, 2009) (stating that "[i]n order to rebut a party's motion for summary judgment, the non-moving party must point to specific facts supported by the record, which demonstrate a genuine issue of material fact [ . . . ] [s]uch specific facts, however, may not come from mere allegations or denials in its own pleading.").

*Reese*, 208 F.3d 736, held that defendant school district, which excluded plaintiff students from commencement ceremony for throwing water balloons at boys in the boys' restroom, did not violate the Equal Protection Clause when it punished female plaintiffs without punishing the male students accused by the plaintiffs.[13]

The record does not support a charge that the school district acted with an impermissible motive, even if its disciplinary action against the plaintiffs can be viewed as harsh. There is no direct evidence of gender animus, nor is there even evidence of system-wide disparate impact in punishments between genders. The plaintiffs concede that the school district has enacted anti-harassment policies and has a record of enforcing those policies when violations are reported in a timely manner. Rather, the plaintiffs rely almost entirely on the fact that in this one case the girls who were caught "in the act" of inappropriate behavior were punished, while the accused boys, whose behavior had not been previously reported, were not punished.

*Id.* at 740.

Here, the Complaint suggests that the Individual Defendants, and GUSD, responded differently to "male-on-female" complaints of sexual abuse and/or sexual discrimination than it did to "male-on-male" incidents of the same conduct, but Plaintiff presents no evidence to support his claims that males and females were treated differently. Absent evidence of unconstitutional motive, Plaintiff's § 1983 claim necessarily fails. Summarily adjudicating Plaintiff's § 1983 in favor of Individual Defendants is consistent with Ninth Circuit precedent. *See Reese, supra.*[14]

---

**13.** Concerning the circumstances of the water balloon fight and the school districts' response in *Reese*, the Ninth Circuit recounted: "The plaintiffs admitted hiding in the boys' bathroom, but argued that they were merely retaliating for several acts of harassment committed by the boys during the school year. Prior to [the school board hearing re: their dismissal], the plaintiffs had never reported any harassment, and the record offers no evi-

dence that the school district actually knew prior to May 28 of the boys' alleged harassment of the girls." *Id.* at 738.

**14.** *But cf. Flores*, 324 F.3d at 1135, where the Ninth Circuit upheld the district court's denial of summary judgment on Plaintiff's § 1983 equal protection claim because "[t]he plaintiffs presented evidence that they were harassed for years and that the defendants failed

It is undisputed that GUSD had a sexual harassment policy in 2006 and that the policy prohibited sexual harassment and gender harassment/discrimination. (DSUF 8.) The record reveals the only permissible inference is that the policy was consistently and fairly applied to male and female students enrolled in the Gustine Unified School District. The record also demonstrates that once school officials learned of the alleged sexual harassment, they suspended the suspected students and, later, expelled them. (PSUF 91–92). Plaintiff does not explain how this treatment differed from similar incidents involving female students, if there were such incidents. There is no record evidence that Plaintiff's coaches treated him differently and discriminated against him because he was a male.

Viewing the evidence in the light most favorable to Plaintiff, no evidence shows a violation of Plaintiff's equal protection constitutional rights. Summary adjudication is GRANTED in favor of Defendants Scudder, Cano, Spaulding, and Souza in their individual capacity on Plaintiff's equal protection claim.

### C. Title IX

Defendants Scudder, Cano, Spaulding, and Souza move for summary judgment, arguing that they cannot be held individually liable under a Title IX theory. (Doc. 91, 10:18–10:21.) Plaintiff does not oppose this motion, abandoning the Title IX cause of action against Defendants Scudder, Cano, Spaulding, and Souza. (See Doc.

107, 7:23–7:25, filed July 27, 2009 (stating Plaintiff "concede[s] dismissal of the following claims: Plaintiff's 42 U.S.C.1983 claim against ... Defendants Scudder, Cano, Spaulding, and Souza, in their official capacity.".)

Summary judgment is GRANTED in favor of Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder as to Plaintiff's Title IX claim for sexual discrimination and harassment.[15]

Defendant GUSD seeks summary judgment against Plaintiff's second claim for a violation of Title IX. Plaintiff alleges that "the severe and pervasive attacks on Plaintiff during the Camp amount to sexual discrimination and harassment in violation of Title IX." The substance of Plaintiff's Title IX claim is that Coach Scudder, the Gustine High School head football coach and supervisor of the GUSD approved football camp, had actual knowledge of the student-to-student sexual harassment occurring during the football camp and took no disciplinary action.

■ Title IX provides, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Recipients of federal funding, like the Gustine Unified School District, may be liable for damages under Title IX for student-on-student sexual harassment. *See Davis v.*

---

to enforce these policies to protect them. When viewed in the context of the other evidence plaintiffs presented and their interactions with the defendants, there is sufficient evidence for a jury to reasonably find that plaintiffs were treated differently."

**15.** Individual defendants cannot be found liable under Title IX: "The Government's enforcement power may only be exercised

against the funding recipient, see [20 USC] § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power." *Davis*, 526 U.S. at 641, 119 S.Ct. 1661 (citations omitted); *see also Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999), cert. denied, 530 U.S. 1262, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000) ("only recipients of federal funds may be held liable for damages under Title IX").

*Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

For student-to-student sexual harassment, four requirements for imposition of school district liability under Title IX are:

(1) the school district must exercise substantial control over both the harassed and the context in which the known harassment occurs, (2) the plaintiff must suffer sexual harassment ... that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school, (3) the school district must have actual knowledge of the harassment, and (4) the school district's deliberate indifference subjects its students to harassment.

*Reese*, 208 F.3d at 739.

Defendant GUSD argues that the alleged harassment was not severe and pervasive; not based on Plaintiff's gender; that the District lacked actual knowledge of alleged sexual harassment; and that there is no evidence of deliberate indifference by GUSD.

### 1. *Substantial Control*

The Supreme Court limited a school district's liability to "circumstances wherein the [district] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 646, 119 S.Ct. 1661; *see also Reese*, 208 F.3d at 739. GUSD argues that the first factor is not met because "the alleged conduct occurred during a voluntary football camp, which was not held on GUSD campus and which occurred during the summer before school was in session." (Doc. 91, 12:5–12:7.)

■ The first requirement is that the District exercised substantial control over the harasser and the context in which the harassment occurs. This requirement can be met by proof that the misconduct oc-

curred "during school hours and on school grounds" or when the "harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646, 119 S.Ct. 1661. The District argues that none of the allegedly harassing acts took place on "school grounds," given that the most egregious conduct took place on the campus of Golden Valley High School. It is undisputed, however, that the football camp was sponsored and promoted by Gustine High School, its football coaches and administrators, was a core part of Gustine High's football program, and was under the supervision of Gustine High teachers and/or football coaches. The record clearly reveals that the players were transported to and from Liberty High School by GUSD buses and that Gustine High School football coaches supervised the players during the bus ride. The football camp was governed by a GUSD Administrative Directive, outlining supervision ratios, disciplinary procedures, and control techniques. This evidence is sufficient to satisfy this threshold inquiry on summary judgment.

### 2. *Pervasive, Severe & Objectively Offensive Harassment*

The second requirement is that the harassment is sufficiently severe, pervasive, and objectively offensive that Plaintiff was denied an educational benefit. *Davis*, 526 U.S. at 633, 119 S.Ct. 1661. This is a two-part inquiry.

#### A. *Severe and Pervasive Sexual Harassment*

■ As for the first part of the second element, Plaintiff has presented enough evidence that the discrimination was "severe, pervasive, and objectively offensive." *Id.* "Whether gender-oriented conduct rises to the level of actionable harassment depends on a constellation of surrounding circumstances, expectation, and relationships, including, but not limited to, the

ages of the harasser and the victim and the number of individuals involved." *Id.* at 651, 119 S.Ct. 1661 (citations omitted). Courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id. Davis* explicitly recognizes that schools serve as the testing ground for a variety of behaviors that would be unacceptable elsewhere, and that only sufficiently egregious behavior will subject a funding recipient to liability:

> [A]t least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661.

In this instance, Plaintiff's facts are that his teammates pinned him down and sexually assaulted him with an air hose, that he was hit with a pillow carrying a foreign object, that a teammate exposed his penis during a football practice, that one of the assailants subsequently touched his buttocks while in the shower, and that he was called homosexual epithets. These incidents, if proved, could amount to severe and pervasive conduct that was objectively offensive under Title IX.

This harassment must amount to sexual harassment prohibited by Title IX. Title IX by its terms provides a remedy only for discrimination or harassment "on the basis of sex." 20 U.S.C. § 1681(a). Harassment on the basis of sex can be perpetrated by an individual of the same sex as the victim for Title VII purposes, *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), and the same reasoning applies in the Title IX context. *See Sherez v. Hawaii Dept. of Educ.,* No. 04–00390–JMS–KSC, 2007 WL 602097 at *7 (D.Haw. Feb. 16, 2007) (stating that "Title VII principles guide the resolution of Title IX sexual harassment and discrimination claims."). Defendant argues that Plaintiff's Title IX claim fails on the ground that the assault is somehow mitigated because his harassers were of the same sex. Specifically, Defendant argues that the incidents of hazing related to "age" and "class standing," not gender. Defendant points to Plaintiff's deposition testimony in an attempt to demonstrate the lack of gender animus:

Q: And as far as [the air pump victims], it sounds like some of them were freshman, and some of them were people in older grades, and some were even high school seniors; is that right?

A: Just to that one senior.

Q: Any other seniors?

A: Not that it would matter.

Q: What about juniors?

A: I doubt it.

Q: So most of them were freshman then?

A: Yeah, not even really sophomores.

(Pl. Dep. 178:7–178:18.)

Although the record demonstrates that the perpetrators grabbed some of their victims from the freshman "sleeping area," and that the pillow fight was "upperclassmen vs. lowerclassmen," this does not eliminate the factual dispute arising from the sexual nature of the perpetrators' acts. Facts demonstrating that the victims may

have been targeted because of their class standing are capable of more than one inference, i.e., the facts are relevant to show animus based on age *and* gender. The two are not mutually exclusive.

The use of gender-based or sexually loaded insults such as "fag" or "homo" can certainly be indicative of animus on the basis of gender, but the use of such terms without more is not necessarily sufficient to establish gender discrimination. The Supreme Court in *Davis* recognized that children are not like adults and often engage in behavior that adults would find inappropriate and offensive, without such behavior necessarily being actionable. 526 U.S. at 652, 119 S.Ct. 1661. Although Title IX was not intended and does not function to protect students from bullying generally, the homophobic language used by the perpetrators appears to be part of a larger constellation of sexually-based conduct, which included assaulting Plaintiff with an air hose, exposing their genitalia, and grabbing his bare buttocks in the shower. Drawing the inferences in Plaintiff's favor, there remains a factual dispute on the issue of whether "the conduct at issue relate[s] to gender."

At oral argument, GUSD maintained that, under Supreme Court precedent, including *Davis*, one instance of peer-on-peer harassment is insufficient to satisfy Title IX. First, taking the evidence in Plaintiff's favor, Plaintiff has identified multiple incidents of sexually-charged harassment by his peers at the football camp in July 2006. Second, several courts have held that a single instance of assault is sufficient to state a Title IX claim. *See T.Z. v. City of N.Y.*, 634 F.Supp.2d 263, 270 (E.D.N.Y.2009) (outlining the cases in which courts have found a single event to withstand a Title IX challenge.)

Drawing all reasonable inferences in Plaintiff's favor, material factual issues exist on the type of sexual harassment pro-hibited by Title IX. A reasonable jury could find that the alleged harassment, name-calling, and other incidents of an aggressive nature, were sufficiently severe and pervasive and were based upon sex.

### B. *Denial or Exclusion from Educational Opportunities*

■ The remaining issue is whether the discrimination "effectively bar[red] the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633, 119 S.Ct. 1661. To satisfy this element, a student need only establish that the sexual harassment was severe, pervasive, and objectively offensive to the point that it undermined and detracted from Plaintiff's educational experience and that he was denied equal access to an institution's resources and opportunities. *Davis*, 526 U.S. at 651, 119 S.Ct. 1661. An evidentiary link between the harassment and access to educational or related services, balanced with the persistence and severity of harassment, can work to establish a disadvantaged environment for the victim. *Davis*, 526 U.S. at 652, 119 S.Ct. 1661. As discussed, this case involves harassment that lasted for at least three days, ultimately resulting in Plaintiff's withdrawal from Gustine High School.

The sum of the District's briefing on the issue is that Plaintiff was not denied access to educational opportunity because "[a]s of July 13, 2006, and at all relevant times thereafter, Plaintiff was permitted to attend Gustine High School and was permitted to participate on the football team [ ] in fact, Plaintiff continued to participate on the football team after the camp." (Doc. 96–2, 12:23–12:27.) Plaintiff's single sentence response was that "the unabated sexually harassing conduct effectively barred the Plaintiff's access to educational opportunities or resources." (Doc. 107, 21:13–21:14.)

■ The most obvious example of student-on-student sexual harassment capable

of triggering a damages claim involves the overt, physical deprivation of access to school resources. *Davis* at 650, 119 S.Ct. 1661. It is not necessary, however, to show physical exclusion to demonstrate that a student has been deprived of an educational opportunity by the actions of another student. *Id.* at 651, 119 S.Ct. 1661. Rather, the harassment must have a "concrete, negative effect" on the victim's education or access to school-related resources. *Id.* at 654, 119 S.Ct. 1661. Examples of a negative impact on access may include dropping grades, *id.* at 634, 119 S.Ct. 1661, being diagnosed with behavioral and/or anxiety disorders, *Theno v. Tonganoxie Unified School District No. 464,* 377 F.Supp.2d 952, 968 (D.Kan.2005), becoming homebound or hospitalized due to harassment, *see Murrell v. School District No. 1, Denver, Colorado,* 186 F.3d 1238, 1248–49 (10th Cir.1999), physical violence, *see Vance v. Spencer County Public School District,* 231 F.3d 253, 259 (6th Cir.2000), or sexual assault, *see Williams v. Board of Regents of University System of Georgia,* 477 F.3d 1282, 1299 (11th Cir.2007). Plaintiff presents evidence of consistent and substantial abuse throughout the Gustine High football camp, including during actual practice sessions, the free periods between practices, during sleeping periods, and during evening free periods. These incidents allegedly occurred in Liberty High's open gymnasium, on the practice field, in the locker room, and in the showers. Construing the evidence in Plaintiff's favor, the trier of fact could reasonably conclude that Plaintiff's ability to access Gustine High's athletic resources was sufficiently impaired and denied because of the level of harassment he received by his peers at the Gustine High football camp, at least from July 13th through July 15th.

*Doe ex rel. Doe v. Coventry Board of Education,* 630 F.Supp.2d 226 (D.Conn. 2009), ("*Coventry*"), a case where the court found a genuine issue of material fact on the issue of Plaintiff's access to her school's educational opportunities, is instructive:

> The mere fact that [Plaintiff] Mary Doe and Jesse attended school together could be found to constitute pervasive, severe, and objectively offensive harassment so as to deny Mary Doe equal access to school resources and opportunities. The evidence shows that Jesse was permitted to continue attending school with Mary Doe for three years after the assault, leaving constant potential for interactions between the two. Although the Defendant argues otherwise, a reasonable jury could conclude that Jesse's mere presence at the high school was harassing because it exposed [Plaintiff] to the possibility of an encounter with him.
>
> As potential interactions between Mary Doe and Jesse are enough to preclude summary judgment in favor of the Defendant, actual interactions between the victim and her assailant could also be found to create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided to her at school. The record shows that Mary Doe and Jesse shared a lunch period and class during their sophomore year, and shared a class together the first day of their junior year. Mary Doe testified in her deposition that: "[Jesse] was always everywhere I looked. I always had to see him." Mary Doe also stated that her "prom memories are pretty much trashed because [she] saw [Jesse] the whole time." A jury could reasonably conclude that the circumstances were sufficiently pervasive, severe, and objectively offensive so as to detract from Mary Doe's educational experience.

*Id.* at 233. (citations omitted).

In this case, Plaintiff practiced, scrimmaged, showered, and slept with his

assailants for the duration of the football camp, as well as practicing with them when he returned to practice in August 2006.[16] Although *Coventry* presents different facts, taking the evidence in his favor, Plaintiff has presented enough evidence that, if believed by a jury, could support a finding of a denial of athletic opportunities.[17]

At oral argument, GUSD argued that Plaintiff's mother's removal of him from Gustine High in 2006 acts as a "waiver" and bars him from establishing that he was deprived access to the education opportunities or benefits provided by Gustine High. This argument was not fully briefed by the District, therefore the impact of Plaintiff's removal from Gustine High school by his mother is unclear. Since Plaintiff has created a triable issue of material fact as to whether he was denied access to Gustine High's resources in July 2006, prior to his removal from Gustine High in August 2006, this issue need not be resolved at this time.

### 3. *Actual Knowledge*

■ The third requirement is that Defendant must have actual knowledge of the harassment. In order for a funding recipient to be subject to Title IX liability, "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [must have] actual knowledge of discrimination." *Reese*, 208 F.3d at 739 (citation omitted).[18] "Although the actual knowledge standard has been applied repeatedly by courts since *Gebser v. Lago Vista Indep. Sch. Dist.* [524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)] its contours have yet to be fully defined." *Doe A. v. Green*, 298 F.Supp.2d 1025, 1034 (D.Nev.2004); *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F.Supp.2d 304, 320 (S.D.N.Y.2000) (citation omitted). "It is difficult to define what kind of notice is sufficient." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F.Supp.2d 387, 397 (E.D.N.Y. 2005) (citation omitted).

Plaintiff does not claim that he ever reported his own alleged harassment to any GUSD official prior to Coach Cano reporting the matter to Principal Shaw on July 20, 2006. Nevertheless, Plaintiff argues that Title IX's actual knowledge requirement is satisfied because "Scudder admitted that he observed several of the students assaulting other victims with the air pump in a sexually assaulting manner." (Doc. 107, 21:18–21:20.) Additionally, Plaintiff argues that Scudder knew of the "imminent danger" posed by the group because the group assaulted, in similar fashion, more than fifteen boys on the first two days of the camp. Plaintiff contends that it was impossible for Coach Scudder not to have known about the repeated sexual assaults, given that they were con-

---

**16.** (See Pl. Dep. 210:1–210:7.)

**17.** Based on the summary judgment record, a jury could reasonably conclude that the sexual assault complained of by Plaintiff, as well as the other harassing incidents he endured in July 2006, were "severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the education opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650, 119 S.Ct. 1661.

**18.** The Ninth Circuit has not addressed the contours of the actual notice standard under

*Gebser*. Other courts have attempted to define an appropriate standard that does not require the plaintiff-student to complain of the precise type of harassment upon which the allegations are based, but which ensures that the school had sufficient knowledge to implement remedial measures that should have addressed the alleged conduct underlying the plaintiff's claims. *See, e.g., Doe v. Alameda Unified Sch. Dist.*, No. C 04–02672 CRB, 2006 WL 734348 *3 (N.D.Cal. March 20, 2006).

ducted by the same five-member group in an open gymnasium, the area supervised by Gustine High coaches.

GUSD rejoins that even if it is permissible to impute Coach Scudder's knowledge to GUSD, Coach Scudder did not have actual knowledge of the alleged harassment during the football camp. Defendant contends that the observed acts of alleged harassment "did not qualify as sexual harassment" and were "of a student other than Plaintiff." (Doc. 91, 17:14–17:17.) Defendant asserts that these two distinguishing facts demonstrate the lack of disputed factual issue concerning "actual knowledge" under Title IX.

Defendant's argument that the prior sexual assault and/or conduct must be "plaintiff specific" is unsupported by current case law. Although the Ninth Circuit has not specifically weighed in on the issue, recent decisions from the Fifth, Seventh, Tenth, and Eleventh Circuits, as well as District Courts in Nevada and California, demonstrate that Title IX's third element is satisfied once an appropriate official has actual knowledge of a substantial risk of abuse of students, whether or not directed at Plaintiff specifically. *See Williams*, 477 F.3d at 1293 (finding that the defendants' preexisting knowledge of the harasser's past sexual misconduct—committed against people other than the plaintiff—was relevant when determining whether the plaintiff had stated a claim under Title IX); *Escue v. Northern Oklahoma College*, 450 F.3d 1146, 1153 (10th Cir.2006) (stating that because "actual knowledge of discrimination in the recipient's program is sufficient, . . . harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX"); *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004) (recognizing that, "in *Davis* the Court required knowledge only of 'acts of sexual harassment' by the [harasser], . . .

not of previous acts directed against the particular plaintiff"); *Doe v. Farmer*, No. 3:06–0202, 2009 WL 3768906 at *9 (M.D.Tenn. Nov. 9, 2009) ("the actual notice required by *Gebser* is not notice that a particular plaintiff was being abused."); *Michelle M. v. Dunsmuir Joint Union School Dist.*, 2006 WL 2927485, at *6 (E.D.Cal.2006) (denying summary judgement "[i]n view of defendants' knowledge of [plaintiff's harasser's] prior behavior"); *Doe A.*, 298 F.Supp.2d at 1033–34 (finding that liability could be based on "actual knowledge of a substantial risk of abuse to students based on prior complaints by other students"); *Johnson v. Galen Health Institutes, Inc.*, 267 F.Supp.2d 679, 688 (W.D.Ky.2003) ("[T]he actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students.").

The case law reveals no requirement that the appropriate district officials observe prior acts of a sexual nature against Plaintiff himself to establish "actual knowledge" under Title IX; rather the test is whether the appropriate official possessed enough knowledge of the harassment that he or she reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.

In arguing that the circumstances of the present case create a triable issue of fact on the issue of "actual knowledge," Plaintiff states that Coach Scudder personally observed the group assault Kevin St. Jean, a Gustine High football player, with an air hose. Plaintiff characterizes the attack as "a sexual assault" in that the group of boys "were trying to stick an air mattress pump nozzle up someone's shorts." (Reporter's Transcript ("RT"), August 10, 2009, 19:13–19:17.) Defendant maintains that "there was nothing sexual—from Scudder—

Coach Scudder's point of view, there was nothing sexual involved." (*Id.* 18:23–18:25.)

Coach Scudder's deposition testimony demonstrates that he knew about the assault on St. Jean on July 14, 2005; that he witnessed the incident, but considered it "childish behavior" warranting only a verbal reprimand. The deposition testimony further indicates that Coach Scudder witnessed the boys run across the gym, attack St. Jean on his bed, restrain his arms and legs, and attempt to insert a battery-operated air pump up St. Jean's shorts:

Q. After the coaches' meeting, did you back inside the gym?

A. I did.

Q. And did you see anything unusual?

A. That time I did. As I was entering the—entering into the foyer into the gymnasium, I saw a group of four or five football players, Gustine high football players, running across the gym, and they ended up all together at another young man's air mattress. They were holding him down. He was sitting on his mattress, and it was a couple on his arms, couple on his feet, and I believe it was Kyle Simmons had the air pump and he was blowing it up the front of Kevin St. Jean's shorts [ . . . ]

Q. Okay. You saw this group of boys running across the gym?

A. Uh-huh.

Q. Were they chasing Kevin St. Jean

A. No. Kevin was sitting down on his bunk at the time or sitting down on his air mattress at the time.

Q. How far did you see this group of boys run?

A. They were already past mid court when I came into the gym, so it was maybe 20 feet, 25 feet.

Q. And St. Jean was sitting on his mattress—

A. Sitting.

Q. —at the time. And this group of boys ran over to him on his mattress.

A. Yes.

Q. And what did they do?

A. As I said, they grabbed his arms and his legs, and I was yelling for them to stop, I saw Kyle lift his shorts and blow air up the leg of his shorts.

Q. Kyle Simmons did that?

A. Yes.

Q. Were—was this a situation where one of these boys was holding one arm, another another arm?

A. Basically, yes.

Q. So they had him spread?

A. They didn't have him spread down. I mean, he was sitting there. They had his arms pinned to the side, and his knees were down, so they had his legs on the air mattress.

Q. So he couldn't move basically?

A. Kevin was a strong kid. He could have moved, but he was just, what are you guys doing, you're being idiots. The look on his face was like what are you doing?

Q. And it was Kyle who put the air mattress pump inside his shorts?

A. I believe so, yes.

(Scudder Dep. 152:2–154:19.)

■ Here, there are two conflicting interpretations on whether the St. Jean incident provides "actual knowledge" of actionable conduct under Title IX. Defendant characterizes the event as "horseplay" or "kids just being kids." This is contrary to Plaintiff's experience in the incident. According to Plaintiff, Coach Scudder had actual knowledge of sexual discrimination

based on the participants at issue, the similarity of other assaults, the use of force by the perpetrators, the positioning of the victim while he was assaulted, and the attempt to place a battery operated device up the shorts of a restrained individual.

On the current record, taking the evidence in Plaintiff's favor, whether this conduct was sexual in nature or was instead indicative of childish behavior gone too far is a function of intent and cannot be resolved. The total dispute over the sexual nature of the St. Jean assault precludes an entry of summary judgment in this case.

Under the Supreme Court's Title IX analysis, a school district's opportunity to respond and remedy a situation depends on its actual notice of the alleged discrimination; if it is unclear whether the predicate of that knowledge is sexual in nature, that dispute must be considered when determining the district's liability or, in this case, whether to grant or deny summary adjudication. Defendant's argument is similar to the argument raised in *Brodeur v. Claremont School District*, 626 F.Supp.2d 195 (D.N.H.2009):

> The District acknowledges that the sexual harassment policy was not followed, but maintains that Couture's response was still not clearly unreasonable because he did not view the comments as sexual harassment. The best that can

be said of this argument for the moment is that a jury could rationally find otherwise [ . . . . ]

*Id.* at 211–12 (quotations omitted).

Viewing the facts in a light most favorable to Plaintiff, a reasonable finder of fact could conclude that the St. Jean episode was sexually-motivated and that Coach Scudder "possessed enough knowledge of the harassment that [he or she] reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." [19]

The potential difficulties inherent in assessing the attack on Kevin St. Jean on July 15, 2006 demonstrate why the resolution of this issue depends on how the facts are ultimately determined by the trier of fact. According to Plaintiff, the St. Jean assault provided Defendant with sufficient notice of "at least some incidents of harassment in order for liability to attach." Defendant characterizes the incident as horseplay among young men and deny any sexual connotation or connection. Given the dispute over the proper factual interpretation of the St. Jean incident, which provides the underlying basis for Title XI liability, summary adjudication is not appropriate. A jury must decide whether Coach Scudder's observations on the afternoon of July 14, 2006 constitute actual knowledge under Title IX. [20]

**19.** To further establish a triable issue of fact, Plaintiff challenges that "Scudder and other GUSD coaches saw much more of the hazing and sexual harassment committed by the players than they will readily admit." (Doc. 107, 21:21–21:24.) However, as Defendant correctly argues, Title IX liability does not attach liability simply because a school or district "should have known" about sexual and/or gender discrimination. *See, e.g., P.H. v. Sch. Dist. of Kansas City, Mo.,* 265 F.3d 653, 663 (8th Cir.2001) (citation omitted).

**20.** The District argues that the St. Jean incident "did not qualify as sexual harassment"

and "was not severe and pervasive conduct." The District's first point represents its legal opinion that the conduct did not reach the level of notice required to meet *Davis'* standard. Defendant's subjective factual interpretations are not dispositive of claims at the summary judgment stage. Though this is a close case and the evidence of actual notice is predominantly based on Scudder's observations of the St. Jean incident, Plaintiff has marshaled enough evidence to raise a genuine issue of material fact regarding GUSD's actual knowledge of sexual harassment/discrimination in July of 2006.

This does not end the inquiry. A school district can be held liable under Title IX only if an appropriate person had knowledge of the abuse. The Supreme Court in *Gebser* stated that an "appropriate person" is, "at a minimum, an official of the [school district] with authority to take corrective action to end the discrimination." 524 U.S. at 290, 118 S.Ct. 1989. This person must be able to "address the alleged discrimination and to institute corrective measures." *Id.*

Plaintiff argues that the inaction of a teacher or coach can give rise to Title IX liability, relying primarily upon *Nicole M. v. Martinez Unified School District,* 964 F.Supp. 1369 (N.D.Cal.1997). Plaintiff contends that "[a]lthough no cases were found regarding whether a teacher is a person whose knowledge can be imputed to the district, it would appear that if the school district has a policy which addresses sexual harassment in athletics, and which policy designates the head coach and teacher with the authority to take corrective measures, then the person so designated should be an appropriate person." (Doc. 107, 22:9–22:13.) Defendant rejoins only that "Plaintiff concedes that Defendant Scudder did not have actual notice of alleged harassment of Plaintiff, therefore whether Scudder is an appropriate person is immaterial." (Doc. 116, 17:18–17:20.)

Although the issue is not thoroughly briefed by the parties, *Annamaria M. v. Napa Valley Unified School Dist.,* 2006 WL 1525733 (N.D.Cal.2006), is instructive:

In *Nicole M.,* Judge Patel decided—as a matter of first impression in the Ninth Circuit and in the pre-*Gebser/Davis* Title IX landscape—that peer harassment is actionable under Title IX. As one basis for her decision, Judge Patel reasoned that a "teacher whose agency status is sufficient to hold the district liable for her harassment of a student stands in no different position when she knows of peer sexual harassment." Significantly, no teacher was named as a defendant in *Nicole M.,* which relegates this language to the status of obiter dicta. Of more fundamental importance, however, Judge Patel's rationale was explicitly based on agency principles. Intervening Supreme Court authority makes clear that Title IX liability cannot be imputed to a school district merely on the basis of agency principles. Rather, Title IX liability can be predicated only upon the acts or omissions of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination."

Unsurprisingly, then, the Eleventh Circuit has recognized that it is "an open question" whether a teacher's deliberate indifference can trigger Title IX liability after Davis. The Tenth Circuit has opined that when peer harassment occurs on school grounds, "teachers may well possess the requisite control necessary to take corrective action to end the discrimination." Still, the Tenth Circuit acknowledged that "[b]ecause officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." "In order to answer the question, it would be necessary to examine how [California] law organizes its public schools, the authority and responsibility granted by state law to teachers, the school district's discrimination policies and procedures, and the facts and circumstances of the particular case."

*Id.* at \*3–4 (citations omitted).

Case law does not expressly limit the employee who may trigger a school district's liability under Title IX; it is an "open question." *See, e.g., Hawkins v. Sar-*

*asota County Sch. Bd.*, 322 F.3d 1279, 1286 (11th Cir.2003) ("We likewise consider the issue of whether notice to a teacher constitutes actual knowledge on the part of a school board to be open."). School districts are liable if "an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so." *Gebser*, 524 U.S. at 280, 118 S.Ct. 1989. "[S]chool districts contain a number of layers below the school board: superintendents, principals, vice-principals, and teachers and coaches, not to mention specialized counselors such as Title IX coordinators. Different school districts may assign different duties to these positions or even reject the traditional hierarchical structure altogether." *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir.1997). Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry.

Here, Coach Scudder was employed by GUSD as the head varsity football coach and a teacher. At the time of the camp, Gustine High did not employ an athletic director, which may have created an administrative void between the head football coach and the principal. The record demonstrates that Scudder formulated every aspect of the Gustine High football program, as well as the July 2006 football camp. He was the chief administrator and disciplinary authority over the football program. As to the July 2006 football camp, Scudder acted as an administrative proxy between the football program and GUSD, obtained approval for the athletes' transportation (by GUSD buses) and overnight "field trip" status, prepared and requisitioned permission slips, determined eligibility criteria, formatted attendance of both athletes and coaches, and was admittedly responsible for the athletes "on and off the field." He also conducted the football aspects of the camp, interacted with boosters, and was considered the "school personnel in charge" under GUSD's Administrative Directive. On the present record and without evidence from the District, it cannot be established as a matter of law that Coach Scudder was not an "appropriate person" for purposes of Title IX.[21]

### 4. *Deliberate Indifference*

Defendant argues that they are entitled to summary adjudication on the issue of deliberate indifference because, as a matter of law, its response once learning of Plaintiff's assault was not "clearly unreasonable." Defendant contends that via its employees and administrators, the district followed its sexual harassment and gender harassment/discrimination policies, which resulted in an investigation of Plaintiff's allegations and, ultimately, expulsion of the offending students. Plaintiff's opposition to summary adjudication focuses on different issues. While Plaintiff concedes that GUSD investigated Plaintiff's assault and later expelled the responsible students, he maintains that GUSD's response violated Title IX—and was deliberately indifferent—because it was "too little too late." Plaintiff also rejoins that Coach Scudder had actual knowledge of the sexual harassment—by virtue of observing the

---

21. The *Davis* court did not explicitly discuss the role of the school employee who must know about harassment by a fellow student before it is actionable, but held that notice of harassment to the principal and two teachers was deemed sufficient to support a cause of action under Title IX. In dissent, Justice Kennedy suggested that in most cases of student misbehavior it is the teacher, at least in the first instance, who has authority to punish the offender and remedy the harassment. *Davis*, 526 U.S. at 679, 119 S.Ct. 1661 (Kennedy, J., dissenting).

St. Jean incident—, but did not comply with the requirements of Title IX in that he failed to "take corrective action to end the discrimination."

■ A school district is liable for damages under Title IX only where the district itself remains deliberately indifferent to known acts of harassment. *Davis,* 526 U.S. at 642–43, 119 S.Ct. 1661. The Supreme Court spent much of its *Davis* opinion emphasizing the limits on its "deliberate indifference" holding, rejecting any suggestion that is was imposing a reasonableness standard on school administrators: "On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49, 119 S.Ct. 1661. The Supreme Court cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *id.,* and stressed that its holding "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648, 119 S.Ct. 1661.

"Deliberate indifference" is more than a "mere reasonableness standard that transforms every school disciplinary decision into a jury question," *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 141 (2d Cir.1999), and "describes a state of mind more blameworthy than negligence." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). But "deliberate indifference" is also "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* "Deliberate indifference will often be a fact-laden question," for which bright lines are ill-suited. *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 457 n. 12 (5th Cir.1994); *see also Doe A. v. Green,* 298 F.Supp.2d at 1035–36 n. 4 (stating that no bright line

rule in Ninth Circuit cases defines "deliberate indifference," and from review of cases outside Ninth Circuit, "it is clear that most courts have similarly not discovered such a bright-line").

In his opposition, Plaintiff maintains that summary adjudication is inappropriate because "GUSD's response and remedial measures after the camp were too little too late." (Doc. 102, 24:9–24:10.) Plaintiff alleges that a factual dispute concerning deliberate indifference exists because Coach Cano waited 24 hours to call Principal Shaw after he overhead two players discussing what happened to Plaintiff at the football camp. Plaintiff also contends that Principal Shaw was deliberately indifferent when he waited two days to meet with Coach Cano and several more days before he contacted the police. At oral argument, Plaintiff's counsel argued that Coach Cano and Principal Shaw's response to hearing about the incident on July 13, 2005 constituted deliberate indifference:

> Counsel: Because I'm not so sure that whether Coach Souza actually saw these incidents occurring makes a difference. Because it goes further than that to what the district and its employees did after the camp. We know within a few days of the camp Coach Cano had actual knowledge of what happened to the plaintiff.

> Court: Right. He reported it to the principal a day later, as I understand it [ . . . ] [a]nd then it took a few days for the principal to start the process. And eventually all the boys were expelled.

> Counsel: Well, it's a little more egregious than that, Your Honor. Because Coach Cano overhears this conversation about what happened to Plaintiff, the principal tells him, okay, we'll meet in person the next time I'm

in Gustine because he lives in Merced and didn't want to come to Gustine. So a couple more days pass. Cano finally meets with the principal. We think that was still in the first week. And then they sit on it for a couple more days until the following week. And the only, after parents started contacting the school, did the district do anything about this. So you have at least a week delay between when Cano had actual knowledge of what happened to plaintiff and the time that anything is reported to the police [ . . . ]

(RT, August 10, 2009, 13:5–14:6.)

■■ The record reveals that following the 2006 football camp, Coach Cano led practice while Coach Scudder was at an all-week conference. During practice, Coach Cano overheard a player, Jake Filippini, tell another player that, while at the summer football camp, Plaintiff was held down and an air pump was inserted his rectum. The following day, Coach Cano called Principal Shaw and told him that they needed to meet in-person to discuss "a matter that might have happened at the football camp." Cano and Principal Shaw met at the school two days later, at which time Cano repeated Filippini's statement to Shaw. Approximately five days later, Principal Shaw contacted the Gus-

tine Police Department concerning the incident. The offenders were removed from the football team on July 25, 2006 and GUSD instituted disciplinary proceedings against them.[22]

Although Plaintiff takes issue with GUSD's response—primarily with the pace of Coach Cano and Principal Shaw's investigation, as well as law enforcement and parental notification—reasonable delay by school officials in dealing with alleged sexual harassment does not equal deliberate indifference. *See Oden v. N. Marianas Coll.*, 440 F.3d 1085 (9th Cir.2006). Although the offenders were allowed to continue practicing until July 25th, 2006, the timeframe is not necessarily "clearly unreasonable," especially given the lack of direct corroboration concerning the conduct at issue, the multiple layers of administrative involvement, and the sensitive nature of the accusations. *See Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (stating that if a funding recipient "takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment.").[23]

Plaintiff, however, contends that Coach Scudder's response to the St. Jean incident was clearly unreasonable in light of the known circumstances.[24] Plaintiff points to evidence in the record that shows, among other things, that Coach Scudder knew

---

**22.** The record indicates that expulsion proceedings were instituted against the offenders within two months of the Coach Cano learning about the incident. Specifically, on September 12, 2006, GHS revoked Michael and Kyle Simmons' inter-district transfers, and officially expelled the twins from GHS in October 2006. McKimmie and San Felippo were both expelled from GHS for two semesters.

**23.** In this case, if Coach Cano and Principal Shaw's actions were the only conduct at issue, it is possible that Defendant GUSD could have met its Rule 56 burden and demonstrated, as a matter of law, that no genuine issue of material fact existed as to deliberate indif-

ference. However, GUSD's conduct must be viewed in light of the conduct of its employees, coaches, and administrators, including whether Coach Scudder acted with deliberate indifference after witnessing Kevin St. Jean's assault on July 15, 2006.

**24.** Given the factual dispute over whether Coach Scudder had "actual knowledge" and whether he was an "appropriate person" for purposes of Title IX, GUSD's conduct must be viewed in light of the conduct of its employees, coaches, and administrators, including whether Coach Scudder acted with deliberate indifference after witnessing Kevin St. Jean's assault on July 15, 2006.

that one of the Simmons brothers' interdistrict transfer was in limbo following disciplinary problems; that Tommy San Felippo was suspended for fighting prior to the football camp; that a number of students brought air mattress pumps to the camp, including the Simmons brothers; and that "something unusual" was going on with the Simmons brothers, San Felippo, McKimmie, and Figueroa on the afternoon of July 14, 2006. The summary judgment record also demonstrates that Coach Scudder observed the Simmons brothers, San Felippo, McKimmie, and Figueroa run across the gym and assault Kevin St. Jean with an air hose on July 14, 2006.

Once he observed the St. Jean assault, the record reveals that Coach Scudder verbally admonished the group and told them they were being "childish;" and that he confiscated the air pump from Kyle Simmons and placed it with his own personal belongings. However, Coach Scudder stated in his deposition that the confiscated air pump "was sitting next to all my stuff, and it was there where somebody could have come by and picked it up and used it again, put it back [...] yes, it was in the open."

Plaintiff also points to Coach Scudder's deposition testimony, which he argues demonstrates deliberate indifference: [25]

Q: Did you report this incident to any of these kids' parents?

A: I did not.

Q: Did you talk to any of the other coaches about this incident while you were at the camp?

A: No.

Q: This is probably a variation of the same question, but did you ask Coach Souza if he had seen anything happen with the pump while you were at the camp?

A: I did not.

(Scudder Dep. 158:24–159:14.)

The record also shows that many of the assaults occurred in Liberty High's open gymnasium on July 14, 2006, an area which was admittedly supervised by Gustine High coaches; that the five assailants openly chased their victims, held them down and attempted to assault the students with an air pump; that their victims attempted to evade capture and openly struggled. It also appears that the assaults escalated following the St. Jean assault, culminating in the assault on Plaintiff. According to the record, Gustine High coaches neither witnessed this conduct nor heard "rumors" that such behavior took place.

Both parties attempt to draw factual distinctions and comparisons between this case and others in an attempt to support their contentions as to whether Scudder's conduct constitutes deliberate indifference. (See Doc. 107, 23:4–25:2; Doc. 116, 18:5–19:13.) The cited cases, however, only outline the boundaries of what may or may not constitute "deliberate indifference," discussing the sorts of circumstances under which a court may rule that a particular response was or was not "clearly unreasonable" as a matter of law; they do not offer a bright-line rule defining what constitutes a "clearly unreasonable" response to known harassment or discrimi-

---

**25.** Plaintiff also points to the GUSD Administrative Directive, applicable to the July 2006 football trip, and requires school personnel and chaperones to "ensure proper supervision of the students" and to *"immediately notify* the school personnel in charge of the trip if any suspicious or inappropriate behav- ior is observed." (Doc. 105, Exh. I (emphasis added).) The administrative directive also provides that "there shall be one chaperone or school employee per ten students," which Plaintiff argues was not followed by GUSD or Coach Scudder.

nation in violation of Title IX. Whether a particular response is deliberately indifferent, the inquiry is whether the response was clearly unreasonable in light of the known circumstances to remedy the violation that had occurred. Here, Coach Scudder did not wholly fail to act in response to the St. Jean incident. He confiscated the air pump and verbally reprimanded the offenders. However, he did not investigate the conduct, did not inquire with or report the incident to other coaches/chaperones, and did not take measures to avoid recurrence. As to Coach Cano and Principal Shaw, they commenced an investigation into the July 2006 football camp more than a week after learning of Plaintiff's assault; however, the offenders continued to practice with their victims/teammates during this time. The question is whether those responses "could not have reasonably been expected to remedy the violation," i.e., whether Scudder, Cano, and Shaw's responses were "clearly unreasonable." In light of the known circumstances that occurred during the football camp, and taking the evidence in Plaintiff's favor, it cannot be determined as a matter of law that GUSD's response was not clearly unreasonable.[26]

Although arising from a teacher-student harassment case, *Doe A* is instructive. In finding that the case "did not lend itself well to summary adjudication," *Doe A* noted that the question of whether an institution acted with deliberate indifference under a particular set of circumstances is a question normally left to the jury. 298 F.Supp.2d at 1036 (*citing, e.g., Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir.1992) ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.")); *Davis v. Mason County*, 927 F.2d 1473, 1482 (9th Cir.1991); *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994); *Blair v. City of Pomona*, 206 F.3d 938, 2000 WL 290246, at *5 (9th Cir.2000); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir.2001). A number of "[o]ther district courts have found that the deliberate indifference or clearly unreasonable standard does not lend itself well to a determination by the Court on summary judgment, and have permitted the claim to go to the jury if the plaintiff advanced some evidence in support." *Id.* (citing *Hart v. Paint Valley*, 2002 WL 31951264, at *4 (S.D.Oh.2002) (stating that whether a response is unreasonable under Title IX "does not lend itself well to a determination by the Court on summary judgment")). Here, there is evidence in the record to support a finding that Coach Scudder did not take appropriate or effective remedial measures after his observations of sexual harassment. As a result, a rational trier of fact could conclude that Scudder's response of a verbal warning about "childish behavior," without more, was clearly unreasonable when there is sufficient evidence in the record to support a claim that Scudder was on notice that the offenders were sexually assaulting players with an air hose.

Construing the record and reasonable inferences therefrom in the light most favorable to Plaintiff, a trier of fact could also find that Scudder had "actual notice" on the afternoon of July 14, 2006. It appears from the record an investigation on July 14 or July 15, 2006 would have elicited the same findings the police and district

---

**26.** "A school acts appropriately if it investigates what has already occurred, reasonably tries to end any harassment still ongoing by the offenders, and seeks to prevent the offenders from engaging in such conduct again."

*Patterson v. Hudson Area Schools*, 551 F.3d 438, 460 (6th Cir.2009). Here, during the camp Coach Scudder's actions were ineffective.

investigations later revealed, and could have prevented the sexual assault against Plaintiff, as well as assaults against several other Gustine High players. A question of material fact exists as to to whether GUSD exhibited deliberate indifference. Summary judgment is DENIED on the Title IX claim.

As detailed in §§ V(C)(1)-(4), *supra*, Defendant GUSD has not provided sufficient evidence to either negate an essential element of Plaintiff's Title XI claim nor shown that Plaintiff does not have sufficient evidence to carry his ultimate burden of persuasion at trial. Defendant GUSD's motion for summary adjudication on Plaintiff's Title IX claim is DENIED.

### D. *State Law Claims*

Plaintiff brings several state law claims against Defendants Gustine Unified School District, Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder: intentional infliction of emotional distress (Claim V), violation of Cal. Constitution, art. 1, § 7(a) (Claim VI), violation of Cal. Civil Codes §§ 51, 51.7 and 52.4 (Claims VII–IX), sex discrimination under the Cal. Education Code (Claim X), negligent supervision (Claim XIII), negligence per se (Claim XIV), and negligent training (Claim XV).

▮ The Eleventh Amendment's bar against suing an arm of the state in federal court applies equally to federal and state law claims. *See Durning v. Citibank, N.A.*, 950 F.2d 1419, 1422–23 (9th Cir.1991) ("Although by its terms the Eleventh Amendment only withholds article III jurisdiction from cases predicated upon citizen-state diversity, the Supreme Court has judicially extended its reach to bar federal courts from deciding virtually any case in which a state or the arm of a state is a defendant—even where jurisdiction is predicated upon a federal question—unless the state has affirmatively consented to suit.") (internal quotations omitted); *see also Pena v. Gardner*, 976 F.2d 469, 473 & n. 6 (9th Cir.1992) (discussing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117–23, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

As Gustine Unified School District is an arm of the state, it is protected by the Eleventh Amendment and is immune from Plaintiff's state law claims in this Court. The Eleventh Amendment does not, however, bar Plaintiff's claims against the individual defendants because, for the reasons discussed *supra*, they are sued in their individual capacity. *See Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1125 (9th Cir.2007).

Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder argue they are entitled to immunity on Plaintiff's state law claims pursuant to California Education Code § 35330.[27] The relevant portions of § 35330 provide:

(a) The governing board of a school district or the county superintendent of schools of a county may: (1) Conduct field trips or excursions in connection with courses of instruction or school-related social, educational, cultural, athletic, or school band activities to and from places in the state, any other state, the District of Columbia, or a foreign country for pupils enrolled in elementary or secondary schools.

[. . . .]

---

**27.** California case law has confirmed that individual teachers fall within the immunity protections of § 35330. *See Casterson v. Superior Court,* 101 Cal.App.4th 177, 186–190, 123 Cal.Rptr.2d 637 (2002) ("it is consistent with legislative intent to construe section 35330 as extending field trip immunity to school district employees in order to protect a school district from vicarious liability for an employee's alleged negligence in the course and scope of employment during a field trip.").

(d) All persons making the field trip or excursion shall be deemed to have waived all claims against the district, a charter school, or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion.

Cal. Educ.Code. § 35330(a), (d).

Defendants argue that § 35330(d) provides immunity to school districts, charter schools, and the State of California for injuries occurring during a "field trip" or "excursion." Defendants maintain that the July 2006 football camp is a "field trip" or "excursion" under § 35330 because the camp: (a) was a school-related athletic activity,[28] (b) was voluntary, (c) Plaintiff did not receive a grade or credit for his attendance, and (d) is consistent with § 35330's legislative intent to "protect school districts from exposure to personal injury claims arising from field trips."

Plaintiff argues that § 35330(d)'s statutory immunity is inapplicable to the facts of this case because § 35330(d) "applies only to field trips or excursions occurring off school premises." (Id. at 11:12–11:14.) According to Plaintiff, because "the alleged assault and hazing at issue in this litigation occurred on LHS school grounds ... the camp was not a field trip or excursion to which the immunity of Section 35330(d) applies." (Id. at 11:8–11:18.) Plaintiff essentially argues that GUSD or GHS constructively owned the Liberty High School for purposes of analyzing § 35330.

Plaintiff also contends that § 35330(d) does not apply because: (a) school was not in session at the time of the camp; and (b) case law demonstrates that the proper legal inquiry is not whether the trip was "voluntary," but rather "whether the trip

had the ear markings of a field trip or an excursion," based on compliance with internal district guidelines.

In the context of public schools, the California Legislature has established different rules for injuries occurring during required school-sponsored, off-premises activities, on the one hand (Cal. Ed.Code § 44808), and filed trips or excursions, on the other hand (Cal. Ed.Code § 35330). If a student is injured while off campus for a school-sponsored activity, which is defined as an activity "that requires attendance and for which attendance credit may be given," the student's injury is treated, for liability purposes, in the same manner as an on-campus injury. *Myricks v. Lynwood Unified Sch. Dist.*, 74 Cal.App.4th 231, 239, 87 Cal.Rptr.2d 734 (1999); *see also Ramirez v. Long Beach Unified Sch. Dist.*, 105 Cal.App.4th 182, 189 n. 2, 129 Cal.Rptr.2d 128 (2002). "Students who are off of the school's property for required school purposes are entitled to the same safeguards as those who are on school property, within supervisorial limits." *Id.*

However, if a student is injured while on a field trip or excursion in connection with courses of instruction or school-related social, educational, cultural, athletic, or school band activities he "shall be deemed to have waived all claims against the district or the State of California for injury, accident, illness, or death occurring during or by reason of the field trip or excursion." Cal. Educ.Code, § 35330(d); *Myricks*, 74 Cal.App.4th at 239, 87 Cal.Rptr.2d 734. "Field trip" is defined within the meaning of § 35330 as "a visit made by students and usually a teacher for purposes of first hand observation (as to a factory, farm,

---

28. As opposed to a "school-sponsored activity," which is defined as an activity "that requires attendance and for which attendance credit may given." *Myricks v. Lynwood Unified Sch. Dist.*, 74 Cal.App.4th 231, 239, 87

Cal.Rptr.2d 734 (1999). If a student is injured while off-campus for a school-sponsored activity, the student's injury is treated, for liability purposes, in the same manner as an on-campus injury. *Id.*

clinic, museum)." *Wolfe v. Dublin Unified School Dist.,* 56 Cal.App.4th 126, 132–133, 65 Cal.Rptr.2d 280 (1997). "Excursion" means a "journey chiefly for recreation, a usual brief leisure trip, departure from a direct or proper course, or deviation from a definite path." *Id.*

In *Casterson v. Superior Court,* 101 Cal. App.4th 177, 123 Cal.Rptr.2d 637 (2002), the court provided an in-depth review of the legislative history:

> Our review indicates that the Legislature was concerned that the financial costs of field trips not burden school districts [ . . . . ] [¶] From these legislative history materials, we discern that one aspect of the Legislature's intent in enacting former section 1081.5 in 1967 was to authorize school field trips upon the condition that no public funds be expended for the trips. We further discern that the waiver provision was added in furtherance of this purpose, because it prevents school district exposure to personal injury claims arising from field trips. This intent is apparent throughout the amendments to field trip immunity provisions of former section 1081.5 and section 35330, since the waiver provision has been carried over in each amendment with only slight changes.

*Id.* (citations omitted).

Prior to *Casterson, Castro v. Los Angeles Bd. of Education,* 54 Cal.App.3d 232, 126 Cal.Rptr. 537 (1976), noted:

> The Legislature, by these sections, recognized that: Not all educational facilities can be provided within the confines of each school's property. To accomplish a school's educational aims, it therefore is necessary for students to accomplish portions of their study off the school's property. Students who are off of the school's property for required school purposes are entitled to the same safeguards as those who are on school property, within supervisorial limits. Students who participate in nonrequired trips or excursions, though possibly in furtherance of their education but not as required attendance, are effectively on-their-own; the voluntary nature of the event absolves the district of liability.

*Id.* at 236, 126 Cal.Rptr. 537.

Although Plaintiff contends that a school-organized football camp is not a "field trip" or "excursion" within the meaning of § 35330, several California cases in which immunity was found to exist control the facts of this case.

In *Myricks,* 74 Cal.App.4th 231, 87 Cal. Rptr.2d 734, a case cited by Defendants, several high school basketball players on a summer tournament road trip were injured when, traveling between games, the car of the volunteer driver with whom they were riding drove off the road. The students claimed the summer league was a school-sponsored activity for which the school district could be liable. The District asserted that the summer trip was not school-sponsored and that California's field trip immunity precluded holding the District liable for the players' injuries. *Myricks* found that the summer basketball trip was "not a school-sponsored activity for which attendance was required and attendance credit given" and, assuming the trip was school related at all, the "waiver provisions of Education Code section 35330, subdivision (d) must control." *Id.* at 240, 87 Cal.Rptr.2d 734.

*Barnhart v. Cabrillo Community College,* 76 Cal.App.4th 818, 90 Cal.Rptr.2d 709 (2002), involved a lawsuit by three members of a community college soccer team against the college and their coach for personal injuries suffered in an automobile accident that occurred when the coach, a college employee, was driving plaintiffs from their college to a game in a van owned by the college. At issue in *Barnhart* was whether California Code of

Regulations, title 5, § 55450, provided field trip immunity to community college districts in language identical to the field trip immunity for school districts set forth in § 35330:

> Strictly speaking, plaintiffs' trip to Fresno does not appear to be a field trip given that it was a trip to participate rather than observe; and, though the trip had recreational and pleasurable aspects, the essence of the trip was not excursionary given that the trip was part of a regular activity rather than a departure or deviation from the norm. But title 5, section 55450 itself further describes field trips or excursions. The section supposes that field trips or excursions are conducted "in connection with … school-related … athletic … activities." (tit. 5, § 55450, subd. (a).) School-related athletic activities necessarily include extracurricular sports programs. Thus, by its own terms, title 5, section 55450 places trips in connection with extracurricular sports programs into the narrowly defined field trip or excursion type of school-sponsored activity.

Plaintiffs were therefore on a field trip or excursion; hence, the special or specific immunity statute applies.

*Id.* at 828–829, 90 Cal.Rptr.2d 709.

■■■ Although *Myricks* and *Barnhart* did not specifically deal with students suffering injuries on a "co-sponsor's school property," the issues are substantially the same. The summary judgment record demonstrates that Gustine students were participating in an athletic event on Liberty High property. Gustine Unified School District does not own or otherwise hold an interest in Liberty High School. Like traveling to an away game in *Barnhart* or traveling between tournament games in *Myricks*, the students here were off-campus, participating in a school-related athletic function. Even if Liberty High School were somehow affiliated with Gustine Unified School District, *Anderson v. Cornn*, No. F042137, 2004 WL 396439 (Cal.App. 5 Dist. Mar. 4, 2004) ("*Cornn*"), an unpublished decision,[29] found that § 35330 applies if students have left "their regular school grounds" and are "having their field trip on what may or may not be other [District] property."[30]

---

**29.** The Ninth Circuit has stated that "we may consider unpublished state decisions, even though such opinions have no precedential value." *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir.2003) (citation omitted).

**30.** In *Cornn*, a junior high student alleged that he was injured while at a summer camp promoted by his school. Plaintiff brought claims for negligence against the camp leader and District, alleging that the camp leader, "threw [him] to the ground, held him on his back, and struck him, forcibly, in his chest three (3) times and thereafter stated words to the effect 'Now how does that feel.' " *Id.* at *1. *Cornn* affirmed summary judgment in favor of the District, finding that § 35330 precluded liability:

> Defendants provided undisputed evidence that the trip was entirely voluntary [...] As

stated above, this was undisputedly a field trip [] Castro reaffirms that section 35330 precludes liability for a school district when a student is participating in "nonrequired trips or excursions." Under such circumstances, students are "effectively on their own; the voluntary nature of the event absolves the district of liability." Again, appellant does not dispute that Camp KEEP was voluntary in nature, and KCSOS offered evidence both regarding the voluntary nature of Camp KEEP and that students who did not go remained at the school. Accordingly, whether the activity took place on property also owned by KCSOS does not change the nature of the activity nor the applicability of the immunity. This is especially true where, as here, the students have left their regular school grounds and just happen to be having their field trip on what may or may not be other KCSOS property. *Id.* at *3 (citations omitted).

Plaintiff distinguishes *Myricks, Barnhart,* and *Cornn,* arguing that "none of the cases [...] support the proposition that a school sponsored event which occurred outside of the school year and where student attendance is not credited, is the type of field trip or excursion that was contemplated by Section 35330." (Doc. 107, 15:4–15:9.) Plaintiff is incorrect. *See Myricks,* 74 Cal.App.4th 231, 87 Cal.Rptr.2d 734 (applying § 35330 to a summer basketball tournament); *Elbaz v. Beverly Hills Unified Sch. Dist.,* No. B195563, 2007 WL 1545921 (Cal.App. 2 Dist. May 30, 2007) (stating "[w]e conclude that his claims against [the District] have been waived pursuant to section 35330, subdivision (d). As a matter of law, the tournament constituted a field trip or an excursion, not a school-sponsored activity. There are no allegations to indicate that [Plaintiff] was required to attend, or received credit for, taking part in the tournament [...] *[t]he tournament occurred when school was not even in session.*)" (emphasis added); *see also Swearinger v. Fall River Joint Unified Sch. Dist.,* 212 Cal.Rptr. 400, 406 (1985), *review granted and opinion superseded by,* 215 Cal.Rptr. 854, 701 P.2d 1172 (1985) ("One might argue that the basketball tournament [ ] doesn't fit neatly in either category [§ 35330 or § 44808]. However, an examination of the statutory history of the usage of field trip or excursion reveals that that composite term *encompasses all off-campus school activities.*") (emphasis added).

In this case, it is undisputed that the football camp was not a school-sponsored activity for which attendance was required and attendance credit given. Defendants provided substantial evidence that the trip was voluntary, the event was held off campus on the grounds of another school, that it related to athletic endeavors of the high school, and comported with legislative intent. Although the football camp's transportation was coordinated by the District, this fact "bear[s] no relation to whether the road trip was a school sponsored activity" and does not preclude the application of § 35330. *See Myricks,* 74 Cal.App.4th 231, 87 Cal.Rptr.2d 734 ("The out of state tournaments were not part of LHS' formal CIF or summer intersession programs. The fact that LHS authorized two of the plaintiffs to attend the tournaments without being dropped from the summer intersession program and bring school assignments with them does not suggest the road trip was a mandatory or required school activity. Similarly, Barfield's use of LHS facilities and equipment for [team] practices and the district's funding of its employees' emergency post-accident trip [ ] bear no relation to whether the road trip was a school sponsored activity for which attendance was required."). Gustine High School's July 2006 football camp at Liberty High School was a voluntary activity that qualified as a "field trip" within the meaning of the statutory framework. Granting summary judgment in favor of the District is also consistent with California case law, including *Myricks, Barnhart,* and *Cornn,* as well as *Casterson,* the most recent published decision discussing § 35330.

In his opposition, Plaintiff introduces several additional facts into the § 35330 analysis. Specifically, Plaintiff argues that genuine issues of material fact exist as to whether football camp is a field trip or excursion because: (1) students attending the camp did not receive attendance credit from the State School Fund; (2) GUSD did not provide or make available medical or hospital service for students attending the football camp; (3) GUSD did not comply with its own internal guidelines for overnight field trips; and (4) GUSD did not procure permission slips.[31] (Doc. 107,

---

31. Plaintiff cites *Barnhart* for the proposition that the football camp is a field trip or excur-

sion because the students attending the camp

11:8–15:2.)

Plaintiff's opposition provides substantial factual development concerning medical care, internal guidelines, and permission slips. Plaintiff, however, does not support his argument with any legal authority. There is nothing in Plaintiff's 26-page opposition or the accompanying exhibits and declarations to support the proposition that these criteria are relevant to a § 35330 determination. The field trip immunity is clearly defined by § 35330 and the universe of cases interpreting and applying § 35330 is not insubstantial. Without a single legal citation in support, it is impermissible to depart from the statutory language and the substantial California case law interpreting the provision.[32]

Plaintiff has failed to create a triable of fact whether the July 2006 football camp was a field trip or excursion within the meaning of § 35330. Defendants' motion for summary adjudication on the issue of § 35330 immunity is GRANTED as to Plaintiff's state law claims only.

### A. Penal Code § 245.6

Plaintiff argues in his opposition that "notwithstanding the immunity of the Education Code, Penal Code § 245.6[ (e) ] provides an independent cause of action for acts of hazing."[33] However, during oral argument, Plaintiff's counsel conceded that a Penal Code 245.6(e) claim was not specifically pled in the Complaint:

> Court: Then we have Penal Code Section 245.6, which prohibits hazing and it's defined as the initiation or pre-initiation into a student organization or student body. It does not include sanctioned events. Doesn't that end it? You can't have it both ways, can you?
>
> Counsel: I don't think it does. But I think that the threshold issue is whether it was a field trip or excursion because ____
>
> Court: Yes.
>
> Counsel:—if it was not, then we don't even need to go to the hazing statute [ . . . ] Penal Code 245.6 is not a cause of action that was specifically pled in the complaint. It's—
>
> Court: Then it's not a claim.
>
> Counsel: It's just a statute that provides an independent cause of action for hazing activities.

---

did not receive attendance credit from the State School Fund. Plaintiff's citation is unpersuasive; he incorporates § 35330(c)(1), a stand alone portion of § 35330. Section 35330(c)(1) provides: "The attendance or participation of a pupil in a field trip or excursion authorized by this section shall be considered attendance for the purpose of crediting attendance for apportionments from the State School Fund in the fiscal year. Credited attendance resulting from a field trip or excursion shall be limited to the amount of attendance that would have accrued had the pupils not been engaged in the field trip or excursion."

32. Plaintiff argues that "if the camp is found to be an off-premises activity, then Education Code § 44808 applies." (Doc. 107, 17:1–17:3.) However, a "school-sponsored activity," within the meaning of § 44808, is one that students are required to attend and for which they receive credit. *Myricks*, 74 Cal. App.4th at 239–240, 87 Cal.Rptr.2d 734. Here, the football camp was not a "school-sponsored activity" under this definition because attendance was optional. The immunity from liability that is granted under § 44808 does not apply here.

33. Penal Code § 245.6(e) provides, in relevant part:

> (e) The person against whom the hazing is directed may commence a civil action for injury or damages. The action may be brought against any participants in the hazing, or any organization to which the student is seeking membership whose agents, directors, trustees, managers, or officers authorized, requested, commanded, participated in, or ratified the hazing.

Court: But it's not alleged in the complaint, so let's not go there.

Counsel: It's not in the complaint.

(RT 34:6–35:6.)

A party cannot maintain a cause of action that is not specifically pled in the complaint. *See, e.g., Seven Words LLC v. Network Solutions*, 260 F.3d 1089, 1098 (9th Cir.2001); *accord Fox v. Bd. of Trs. of the State Univ. of N.Y.*, 42 F.3d 135, 141–42 (2nd Cir.1994) (rejecting nominal damages claim not mentioned in the complaint). To conclude otherwise would render the pleading requirements of Federal Rules of Civil Procedure illusory. *See* Fed. R.Civ.P. 8(a)(1)-(3) ("A pleading that states a claim for relief must contain [...] a short and plain statement of the claim showing that the pleader is entitled to relief.") Here, it is undisputed that the Complaint does not include a cause of action under Penal Code § 245.6. Plaintiff cannot, as presently constituted, advance a hazing cause of action against any of the named Defendants. Defendants' motion for summary adjudication as to Plaintiff's Penal Code § 245.6 is GRANTED.

## VI. CONCLUSION.

For the reasons set forth above:

### A. *Applicability of "Field Trip" Immunity to Federal Claims*

1. California Education Code § 35330(d), California's "field trip immunity," cannot immunize Defendants from liability resulting from a violation of superceding federal law.

### B. *Section 1983*

1. Summary adjudication is GRANTED in favor of Defendant Gustine Unified School District against Plaintiff as to Plaintiff's § 1983 claim.

2. Summary adjudication is GRANTED in favor of Defendants Scudder, Cano, Spaulding, and Souza in their official capacities on Plaintiff's § 1983 claim.

3. Summary adjudication is GRANTED in favor of Defendants Scudder, Cano, Spaulding, and Souza in their individual capacities on Plaintiff's § 1983 claim.

### C. *Title IX*

1. Summary judgment is GRANTED in favor of Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder as to Plaintiff's Title IX claim for sexual discrimination and harassment.

2. Defendant GUSD has not provided sufficient evidence to either negate an essential element of Plaintiff's Title XI claim or show that Plaintiff does not have sufficient evidence to carry his ultimate burden of persuasion at trial. Defendant GUSD's motion for summary adjudication on Plaintiff's Title IX claim is DENIED.

### D. *State Law Causes of Action*

1. Summary adjudication is GRANTED in favor of Defendants against Plaintiff as to Plaintiff's seventh and ninth causes of action for gender violence.

2. Summary adjudication is GRANTED in favor of Defendant GUSD as to Plaintiff's remaining state law claims. As Gustine Unified School District is an arm of the state, it is protected by the Eleventh Amendment and is immune from Plaintiff's state law claims in this Court.

3. Summary adjudication is GRANTED in favor of Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder as to Plaintiff's remaining state law claims. Defendants Jason Spaulding, Anthony Souza, Adam Cano, and Carl Scudder are entitled to immunity on Plaintiff's state law claims pursuant to California Education Code § 35330(d), California's "field trip immunity."

4. Summary adjudication is GRANTED in favor of Defendants as to Plaintiff's claim under Penal Code § 245.6.

Plaintiff shall submit a form of order consistent with this memorandum decision within five (5) days of electronic service. IT IS SO ORDERED.